## No. 6482.

## M. L. SMISSON *v*. THE STATE.

1. PUBLIC SCHOOL LAND.—Article 7, section 2, of the Constitution, setting apart the alternate sections of land reserved, etc., and all money from the sale thereof, for the support of public schools, does not constitute the relation of trustee on part of the State seized of the lands for the use of another with power of sale added. The lands belong to the State as fully as they did before they were appropriated to the public

purpose by the Constitution. No inhibition against leasing the school
lands can be properly drawn from this dedication of the lands. The
dedication simply withdraws from the Legislature the power to ap-
propriate the land to any other purpose.

2. PUBLIC SCHOOL LANDS MUST BE SOLD.—Section 4, of article 7, of the
Constitution, providing for the sale of the school lands is mandatory,
and leaves no discretion in the Legislature as to the mode in which
the lands shall be ultimately utilized; and a lease without reservation
of right to sell would be against this provision.

3. LEASE OF SCHOOL LAND.—That the lands are to be sold does not inhibit
the temporary leasing of the lands until sales may be made.

4. SAME.—That in the Constitutional Convention the express power to
lease was discussed and abandoned does not control the effect of the
terms used in the Constitution; for the question ultimately is *what* did
the people adopt as the Constitution, and their action was upon the
instrument as voted upon.

5. INTERPRETATION.—The proceedings of the Constitutional Convention
may be referred to to ascertain the meaning of a clause in the Consti-
tution, when such clause is obscure.

6. CONSTRUCTION OF CONSTITUTION.—A power clearly legislative in its
character not expressly denied to the Legislature ought not to be held
to be denied by implication unless its exercise would obstruct the exer-
cise of a power expressly granted.

7. STATUTES CONSTRUED—LEASE OF SCHOOL LANDS.—Sections 16 and 17
of act of April 12, 1883, and the leases made under the same, expressly
reserving the right to sell the land at any time, although leased, inter-
posed no hinderance to the full exercise of the express power given to
the legislature to sell the school lands. Such lease of school land is
lawful.

8. MINIMUM PRICE PER ACRE.—The Legislature in effect, in prescribing
the duties of the land board, enjoined upon them to lease to such per-
sons as would pay four cents per acre per annum, unless more be
offered, when the lease shall be to the one bidding more upon his com-
plying with the regulations for the security of the rental to the State.
The action of the Board in fixing another minimum price was inconsist-
ent with law under which the Board was acting, and therefore void.

9. LEASE FOR GREATER THAN MINIMUM VALID.—The appellant having
bid the larger sum, the land was awarded to him, he executed the lease
contract for the larger sum; having done so he is liable for the stipu-
lated rent. His act in making the contract was voluntary, and the Land
Board had the power to make the lease.

10. COMPETITIVE BIDS.—It was not necessary that there should be com-
petitive bids. All the law required was that opportunity for such
bids should be given. This was exacted by the regulations of the Land
Board.

APPEAL from Travis. Tried below before the Hon. A. S.
Walker.

A full statement of the case is given in the opinion of the court.

Several cases were submitted together, involving the same issues. The records in the other cases have not yet reached the Reporter.

*Hancock, Shelley & Hancock*, for appellant: The people, by their delegates in convention assembled to frame and ordain their organic law, dedicated to the support of a system of public free schools all the alternate sections of land reserved by the State out of grants theretofore made, or that might thereafter be made to railroads or other corporations of any nature whatsoever. (Sec. 2, art. 7, Const.)

What is dedication? (Bouvier; The Town of Pawlett v. Clark, 9 Cranch, 292; 2 Peters, 566; 6 Howard, N. Y., 407; 3 Kent, 450.)

And herein of the effect of dedication, as to future disposition of the property dedicated. It is held in trust to be administered as directed by the grantor, and can not be diverted to other uses. (6 Wait's Actions and Defenses, 305; 2 Id., 716; 42 Cal., 541.)

2. Having made the dedication, the Constitution in express terms directs what shall be done with the subject matter dedicated, the lands; that they shall be sold, and how the proceeds shall be employed and applied to the purposes of the dedication and remits to the Legislature to determine when and upon what terms and under what regulations the sale shall be made. (Const., sec. 4, art. 7.)

3. The positive direction given by the people in their Constitution that the lands which they had dedicated, appropriated, set apart from the public domain, should be sold, contains by implication a positive inhibition of anything contrary to it, or which would frustrate or disappoint the purpose of the direction given. (Cooley's Const. Lim., 107; People v. Draper, 15 N. Y., 532, 544.)

Negative words are not essential to create a valid limitation.

Limitations need not appear by express terms.

The rule is, in the construction of statutes, as quoted and adopted in Bryan v. Sundberg, 5 Texas, 423.

Affirmatives in statutes, that introduce a new rule, imply a negative of all that is not within the purview.

Affirmative words in a statute do sometimes, and it is believed where the public is concerned in the performance of official duties, they do always imply a negative of what is not affirmed, as strongly as if expressed.

And where a statute limits a thing to be done in a particular form, it includes in itself a negative, to wit, that it shall not be done otherwise. (1 Kent's Com., 5th ed., 467n, quoted in Bryan v. Sundberg, 5 Texas, 423.)

4. While the accepted canon of construction of State constitutions is that they are limitations upon the exercise of power which belonged to the people through the legislative department of their organized government, yet, when the people, in their organic law, have expressed their will and given positive direction upon any subject, it must be construed and held to be a negation of power in the Legislature to do anything not in pursuance of that expression, or that would frustrate or disappoint it. (Cooley's Const. Lim., cited above and other authorities cited.)

The Legislature can not go beyond a specifically granted power. (Cooley's Const'l Lim., star p. 64, n. 1, p. 78; Id., star p. 88; The People v. Simeon Draper, 15 N. Y., 554, cited above; State v. Hallock, 14 Nev., 202.)

5. The enactment of the Legislature providing for the lease of school lands is in excess of legislative power. Enactments in excess of legislative power are void. (Cooley on Const. Lim., star p. 174.)

6. The Constitution directing that the school lands shall be sold, leaving to the Legislature to provide regulations and the time and terms of the sales is equivalent to an express inhibition of any other disposition of said lands. A trust was created in the legislative department to administer the trust. Trustees with power of sale can not grant leases. (Perry on Trusts, secs. 769, 783, 786; Hill on Trustees, star p. 476 and note.

II. The Land Board exercised legislative power, or power which belonged exclusively to the legislative department, and if such power was derived from the act authorizing the leasing of school lands, is in contravention and violation of the Constitution. (Sec. 1, art. 2, Const.; Willis v. Owen, 43 Texas, 41.)

The Legislature fixed the minimum rental at four cents per acre per annum. The Land Board legislated as to such minimum, and fixed it, at one time at eight and at another at six

cents per acre, for dry sections, and twenty cents for watered sections. (Order No. 8, Tr., 34; sec. 1, art. 2, Const.; sec. 6, art. 4, Const.; sec. 40, art. 16, Const.)

III. The court erred in overruling defendant's third special exception to plaintiff's petition, for this, that the arbitrary requirement of the Land Board of a greater minimum than four cents per acre, was the exercise of legislative power, and was without authority, and void as to the excess of rental above four cents per acre, as fixed by the Legislature.

Passing over the question of the constitutionality of the provision of the statute authorizing the leasing of school lands, the action of the Land Board by regulation fixing a minimum rental per acre above that fixed by the Legislature, was without authority under the Constitution; in violation of the terms of the statute, in that it prohibited competition, and made contracts, by parties having necessity to use the school lands, compulsory at the rate demanded by the Board.

*James S. Hogg,* Attorney General, *James H. Robertson,* District Attorney, and *H. B. Marsh,* for appellee: There is no inhibition in the Constitution against the leasing of the school lands by the Legislature, and the fact that there is an express provision that the lands shall be sold does not imply a want of power in the Legislature to lease or otherwise manage and control the lands in a manner not contrary to the Constitution.

The petition was in the usual form, and it was alleged that the land was leased to the appellant by the Land Board under the authority of an act of the Legislature of the State of Texas, approved on the twelfth day of April, 1883, entitled ' an act to provide for the classification, sale and lease of the lands heretofore or hereafter surveyed and set apart for the benefit of the common school, University, Lunatic, Blind, Deaf and Dumb, and Orphan Asylums," and in accordance with the resolutions and instructions of said Land Board.

Appellant's first special exception was as follows, to wit: Defendant specially excepts to plaintiff's right to a recovery against him upon the pretended contract of lease as set out and alleged in plaintiff's petition; for this, that said contract of lease was made under authority of an act of the Legislature of the State of Texas, approved on the twelfth day of April, 1883 (here followed title of act as above set out), said act of the Legislature being unconstitutional and void as to the provisions

of the leasing of said land, and therefore conferring no author-
ity upon the pretended Land Board to make the pretended con-
tracts as alleged in said petition. (State Constitution, art. 8,
secs. 1, 2, 4; Barker v. Torrey, 4 S. W. Rep., 646, Day Land and
Cattle Co. v. The State, 68 Texas, 546; Sedg. on Con. of Stat.
and Const. Law, 46, et seq., note a, p. 418; Cooley's Const. Lim.,
204, 208, 209; The State v. Tait et al., 22 Iowa, 141; Purczell v.
Smith, 21 Iowa, 540; People v. Rogers, 13 Cal., 159.)

The Legislature, for the purpose of carrying out the object
for which the land was set apart, has the authority to deal with
the school lands in such manner as it sees fit, so long as it does
not impair the rights of the school fund therein and divert the
lands to a different purpose from that to which they were
donated by the Constitution. (Milam County v. Bateman et
al., 54 Texas, 166.)

The Legislature possessed the power, irrespective of consti-
tutional grant, to provide for the lease of the lands belonging
to the school fund, and the express provision in the Constitution
that the lands should be sold did not, therefore, exclude the
power of the Legislature to provide for the lease thereof.
(Brown v. Buzan, 24 Ind., 194; 23 Wis., 339.)

The Legislature in enacting the act of April 12, 1883, in pro-
viding a Land Board, did not create new offices to be held by
the different heads of departments therein enumerated, but it
only annexed new and additional duties to the officers for
which they were elected. (Act April 12, 1883, p. 85, Laws
Eighteenth Leg.; 6 W. Va., Bridges v. Shallcross; 72 Am.
Decis., 179, note, Shelby v. Alcorn.)

The Legislature by the act of April 12, 1883, did not attempt
to delegate legislative power upon the Land Board. The Board
was only the agency appointed by the Legislature to carry out
the provisions of the law. (91 Ill., 357, People v. Harper et al.;
5 Fed. Reporter, 641, Tilley v. S. F. & Ry. Co.; 39 Ala., 247, In-
gram v. The State; 1 Ohio State Rep., 77, Cincinnati Ry. Co. v.
Clinton Co.)

The Land Board was invested with power and authority
to fix the rental price of the lands per acre at any amount
not less than four cents, and to make such rules and regula-
tions as was reasonably adapted to and necessary to carry out
the purposes of the act. (Act April 12, 1883, Gen. Laws Eigh-
teenth Leg., p. 85; 91 Ill., 357, People v. Harper; 5 Fed. Rep.,
641, Tilly v. S. F. & W. Ry. Co.)

STAYTON, CHIEF JUSTICE.  The nature of this action, the defenses set up, the rulings of the court below, the result and the grounds on which a reversal is asked are thus correctly stated in the brief for appellant:

"This suit was instituted in the name of the State of Texas, on five contracts by the appellant, Smisson, with what is styled "The Land Board" for the lease of alternate sections of land belonging to the public school fund, under an act of the Legislature, approved April 12, 1883, entitled "An act to provide for the classification, sale and lease of the lands heretofore or hereafter surveyed and set apart for the benefit of the common school, University, the Lunatic, Blind, Deaf and Dumb, and Orphan Asylum funds," made at different dates, from the twenty-third day of June, A. D. 1884, to and including the fifteenth of October, 1885; each of said leases being for the term of six years from dates prior to the dates of said contracts.

The first contract declared on embraced twenty sections of land, at eight cents per acre, and two sections at twenty cents per acre.

The second contract included eight sections at eight cents per acre.

The third contract embraced eleven sections at eight cents per acre.

The fourth contract was for ten sections of land at six cents per acre.

The fifth contract was for nine sections of land at six cents per acre.

The defendant in the court below answered by general demurrer and special exceptions presenting:

First.  That the act of the Legislature approved April 12, 1883, in so far as said act attempted to confer upon the Land Board, authority to lease the school land, is unconstitutional and void; and said Land Board had no authority by virtue of said act to make the pretended contracts sued on.

Second.  That said pretended contracts were made with a Land Board, so styled, composed of the officers composing the Executive Department of the State, and that the acts of said Land Board, so embracing the officers of the executive department, in the exercise of delegated powers, were and are in contravention and violation of section 1, article 2, of the Constitution, and null and void.

Third. That the act of the Legislature providing for the lease of the school land, were constitutional, and said Land Board in its organization were not in violation of the Constitution, yet the acts of said Board, in fixing the minimum rate of rental for said school lands, above the rate of four cents per acre, as fixed by the Legislature, were in the exercise of Legislative power, not delegated, and that can not be delegated; and that the amount of rental arbitrarily demanded in said contracts by said Board, in excess of the minimum fixed by the Legislature, was without authority, and said contracts, as to such excess, are null and void.

Fourth exception is rather a summary of the second and third.

Fifth. That the pretended contracts are without mutuality in rights and obligations under the terms and provisions thereof. That they were compulsory upon defendant, in their acceptance and execution by him, by the exercise of legislative functions by said Board; in arbitrary orders and regulations made by said Board.

Sixth. That said Land Board assumed to exercise legislative powers, which could not be delegated by the Legislature, by reserving and withholding from sale, or other disposition, portions of said school lands, designated as watered sections.

All of defendant's exceptions were overruled by the court; and the same matters were pleaded by the defendant in bar of a recovery against him.

A jury not having been demanded, the matters of fact as well as of law were submitted to the court; and filing his findings of fact and conclusions of law, the court rendered judgment, in favor of State, for the sum of five thousand eight hundred and eighty-nine dollars and five cents, with interest from date at the rate of eight per cent per annum. To all of which defendant in open court excepted, and gave notice of appeal.

The questions presented upon this record, and eight others which are submitted with it, under agreement, are as follows:

1. The constitutionality of that provision of the statute providing for the leasing of the common school land, which is presented under the first assignment of error.

2. The want of power in the Legislature under the Constitution to make the officers of the executive department of the State a Land Board, and to delegate legislative power to said board, which is presented by the second assignment of error.

3. That said Land Board arbitrarily established regulations not authorized by the act of the Legislature, and exercised legislative power not delegated, and which the Legislature could not delegate to said board under the Constitution; which is presented by the third, fourth, fifth and sixth assignments of error."

The act, under which the leases involved in this case were made, created a Land Board, composed of the Governor, Attorney General, Comptroller, Treasurer and the Commissioner of the General Land Office, who are charged with the duties prescribed by the act, which provided for the sale as well as lease of the common school and other lands to which it has application. This Board was empowered to make regulations for the classification, sale and lease of the lands referred to in the act, and in pursuance of the power thus conferred it did make regulations which gave publicity to bids to purchase or lease lands, and thereby a reasonable opportunity and time was given for competitive bids before any application could be acted upon. These regulations placed the minimum for leases of lands not watered at eight cents per acre per annum, and limited the time for which leases would be made to six years. The minimum price for unwatered lands on lease was subsequently reduced by the Board to six cents per acre per annum. The minimum placed by the Board on leases of watered lands was twenty cents per acre, and some regulations, in reference to such lands, were made which it is unnecessary to state, for none of the lands leased by appellant were of that character. The appellant made application to lease the lands for the rent of which this action was brought, and they were awarded to him by the Board at the price which he bid.

Contracts thereafter were executed by a person on the part of the State thereunto authorized, which evidenced the appellant's right to use the leased land and by him which bound him to pay the rent therefor, which, by his application, he had proposed to pay.

These contracts all reserved the right of the State to sell the lands leased or any part thereof during the lease in accordance with the act creating the Land Board and putting the lands on the market for sale or lease.

The appellant entered, and so far as the record shows, still remains in possession of the lands leased to him, and at differ-

ent times tendered a sum equal to a rental of 4 cents per acre, but has declined to pay more.

It is unnecessary to enter into any critical examination of the true relation of the State—the people—to the common school lands in order to illustrate the fact that the relation imposed by section 2, article 7, of the Constitution, is not that of a trustee seized of lands for the use of another with a naked power of sale added.

Analogies drawn from such a relation have but little, if any, application to the question before us; for such a trustee has no power other than such as the instrument under which he holds and is empowered to sell gives.

Such an instrument creates all the right and gives all the power such as a trustee has, and it must be looked to to determine the extent of his power and the manner in which it must be exercised.

Not so with the State—the people—in relation to the common school lands, which belong to the State as fully as did they before they were appropriated to the public purpose declared by the section of the Constitution to which we have referred.

The purpose for which they are to be used is declared by that section, and if there were no others affecting the question before us there can be no doubt that the people, through the Legislature, might lease the lands for any period of time in order to raise funds for school purposes.

The purpose of a State constitution is not to confer power upon the people which may be exercised through the Legislature, but is to place limitations which the people desire to impose upon the exercise of power by the Legislature and other departments of the government.

The limitation found in the section of the Constitution referred to consists in the withdrawal from the Legislature of the power to appropriate the property therein declared to constitute a perpetual school fund, to any other purpose.  It is insisted, however, that section 4, article 7, of the Constitution provides the only mode in which such lands may be utilized.  That it requires the lands to be sold, and forbids the Legislature to lease them under any circumstances.

If such intention is clearly manifested by the language used, effect must be given to it.  That section provides that "The lands herein set apart to the public free school fund shall be sold under such regulations, at such times and on such terms

as may be prescribed by law; and the Legislature shall not have power to grant any relief to purchasers." It then provides for the investment of the proceeds of sales. The direction in the Constitution that the lands shall be sold is doubtless mandatory, and leaves no discretion in the Legislature as to the mode in which the lands shall be ultimately utilized.

The section quoted, however, left it to be determined by the Legislature at what time and on what terms and under what regulations the sales should be made. These powers were necessarily discretionary. That the people did not intend that the lands made a part of the common school fund should be utilized by a system of leasing for a long or indefinite period, would seem manifest; for if this might be legally done, one Legislature might authorize leases to be made which would deprive a succeeding Legislature of the power to sell the lands unincumbered, although the succeeding Legislature might be of the opinion that the proper time for sales had arrived, and persons were ready to comply with the terms and regulations deemed advantageous by the Legislature.

It may be conceded that it it was not intended by the people, when they adopted the Constitution, that any leases should be made without reservation of right to sell, even for fixed and short periods, whereby any impediment to sales would be created; for it must have been intended that every Legislature should have the power to determine whether the time had come to place the lands upon the market, and if it so determined at once so to place them.

It has been the settled policy of this State to encourage actual settlement, and if leases of large bodies of school lands could be legally made for fixed and even short periods, the tendency of this would be to hinder the sale of such lands, during the lease, to actual settlers.

It appears that during the sitting of the convention that framed the Constitution now in force, a member offered the following substitute for section 5, article 7: "The lands herein set apart for public school purposes shall be utilized under a system of lease or sale, under such rules and regulations as the Legislature shall establish. The proceeds of all lands sold shall be invested in interest bearing bonds of this or some other State. All interest accruing upon said bonds and all money arising from leases shall be annually distributed pro rata among the scholastic population of the State." Which

was rejected, and on this an argument that it was intended to prohibit all leases, is based.

The proceedings of a convention may be looked to in construing a clause of a Constitution framed by it, when it is of doubtful construction; but such evidence is of but little weight, for the intention of the framers of a Constitution is of but little importance—the real question being, What did the people intend by adopting a Constitution framed in language submitted to them? If, however, the people had been fully cognizant of what occurred in the Constitution, or in any way had directly acted in rejecting the substitute offered, it at most would but show that the people were unwilling to give the Legislature the power, so long as the present Constitution remains in force, to refuse to sell the lands and adopt a lease system, whereby millions of acres of land might be held by a tenantry under leases made by authorization of one Legislature, notwithstanding the judgment of succeeding Legislatures might be that the time had arrived when the best interests of the State required the lands to be sold.

In no State has private ownership of land and occupancy by the owner received more encouragement than in this. This policy has been fostered by donations and preferences on sale made in favor of the actual settler, and the provision now found in the Constitution may have been adopted with a view to perpetuate this policy.

That a system such as proposed was rejected does not tend to show that the people, in adopting the Constitution as submitted, intended to prohibit the lease of school lands until such time as they could be sold; and, for the purpose of determining whether such prohibition, not expressed, can be implied from the language used, we must ascertain whether this is necessary to give full effect to the exercise of the power expressly required to be exercised.

A power, clearly legislative in its character, not expressly denied to the Legislature, ought not to be held to be denied by implication unless its exercise would interfere with, frustrate or to some extent defeat the exercise of a power expressly granted. The law under which the leases under consideration were made is found in the sixteenth and seventeenth sections of the act of April 12, 1883 (General Laws 1883, p. 89), and is as follows: "Section 16. Pasture lands or agricultural lands not timbered may be leased in suitable quantities for stock

and ranch purposes, for not less than four cents per acre per annum, and for periods not exceeding ten years, by such agents and under such regulations as the Board may prescribe. The regulations shall provide for competition. Leases shall be made in the localities where the land is situated. Where there is an application for both sale and lease, the sale shall have the preference.

"Section 17. All land shall remain subject to purchase for actual settlement, in bodies not to exceed six hundred and forty acres; but before such purchaser shall be permitted to buy leased land he shall swear that he intends to actually settle on it, and until he does settle, build and fence thereon, the lessee shall remain in possession; provided, that when the lessee has but one watered section leased from the State in the same vicinity, such section shall not be subject to sale and settlement during the term of the lease; and provided further, that when a sale is made of leased land, then the lessee shall be entitled to have a pro rata of any rent he shall have paid in advance refunded to him by the Treasurer of the State, upon warrant drawn by the Comptroller, by order of the Land Board; provided that no inclosure bordering on, along or across any stream of water shall be of width of more than four miles, and a space of at least forty yards shall be left open between all such inclosures."

This law, as well as the leases under which the appellant holds, expressly reserving the right to sell the land at any time, although leased, interposed no hindrance to the full exercise of the express power given to the Legislature to sell the lands.

Under the power vested in the Legislature to prescribe the terms on which sales might be made it was competent for that body to provide for sales only in small bodies and to actual settlers.

The provision that on the sale of leased lands the lessee should not be disturbed in his possession and use for stock and ranch purposes until the purchaser actually settled upon and improved the land is also authorized by the power given to prescribe the terms of sale.

The uses to which the lands might be applied when leased were not such as to render them less valuable or less desirable to persons desiring to purchase.

The provision "that when a lessee has but one watered section leased from the State in the same vicinity such section

shall not be subject to sale and settlement during the terms of the lease," may be inconsistent with the free and full exercise of the power to sell made mandatory by the Constitution whenever in the opinion of the Legislature its exercise becomes desirable; but, if this be so it does not follow that this would render the entire statute invalid, for there is no such connection between this clause and the rest of the statute as would require a holding that the entire statute was thereby invalidated.

If there be provisions in the act inconsistent with the spirit of the Constitution they are not such as affect the question before us.

The power to sell need not have been expressly granted by the Constitution; for in the absence of a prohibition the Legislature would have had that power, and, for this reason, we hold that the intention of the people, by the section of the Constitution under consideration, was to make the exercise of this power mandatory. The effect of this is to withdraw from the Legislature the power to adopt a system for the ultimate utilization of the common school lands otherwise than through sales; but as much was left to the discretion of the Legislature as to the time and terms on which sales should be made, we can not hold that it was thereby intended to withhold from the Legislature the power to temporarily utilize such lands in any manner deemed proper by the Legislature which would not, for a time at least, disable it to fully and freely exercise the power expressly granted.

In the construction of constitutions, as well as of statutes, it has been often held that the powers necessary to the exercise of a power clearly granted will be implied; but we know of no case in which the express grant of a power, legislative in its character, has been held to carry with it an implied prohibition to exercise a power of that character, unless such implication is necessary to the full and free exercise of the power clearly given.

As said by a distinguished elementary writer: "When the power which is exercised is legislative in its character, the courts can enforce only those limitations which the Constitution imposes, and not those implied restrictions which, resting in theory only, the people have been satisfied to leave to the judgment, patriotism and sense of justice of their representatives." (Cooly Const. Lim., 129.)

We think the Legislature of this State had the power to

authorize such leasing of the lands referred to in section 4, article 7, of the Constitution, as will not interfere with the right of the State to sell them whenever the Legislature may deem this proper.

It is claimed that the Land Board exercised powers legislative in their character, which could not be delegated; in that they fixed the minimum rental higher than was it by the Legislature. This goes not to the act itself, but to the exercise of powers assumed under it.

The second section of the act provides: "There shall be, and is hereby created, a State Land Board, which shall be composed of the Governor, Attorney General, Comptroller, Treasurer and Commissioner of the General Land Office, who *shall exercise the powers and perform the duties hereinafter prescribed.*" The sixteenth section declares that "Pasture lands or agricultural lands not timbered, may be leased in suitable quantities for stock and ranch purposes, for not less than four cents per acre per annum." The second section of the act is mandatory in terms, and there is nothing in the entire act to show that it was intended by the Legislature to leave the performance of the duties therein imposed or the exercise of the powers therein granted, to the discretion of the Land Board. That board was empowered, and it was made its duty, to lease lands, but it was restricted in that it was not given power to lease lands for less than four cents per acre per annum.

The word "may," in the connection used in the sixteenth section, was doubtless used in the sense of "shall," and therefore was mandatory. Such is the settled construction where the subject matter is one in which the public have an interest to be protected or promoted by the exercise of a power or performance of a prescribed duty by a public officer, unless the context shows that the word was used in its primary signification.

The Legislature fixed the minimum rental at which it thought it to the interest of the State to lease the lands, and it in effect declared that the Board should lease at that minimum, unless more could be obtained; and, in order that the Board might ascertain whether a higher rental could be obtained it provided for competition, wherein the person offering the highest rental in excess of the minimum fixed by the act, should be entitled to lease the land.

The Board was authorized to make regulations; but it was

evidently not intended that such regulations might be made as would render inoperative and practically annul the statute.

The Legislature, in effect, said to the Board, you shall lease the land to such person as will pay four cents per acre per annum for it, unless some person will bid more, in which event you will lease to the latter upon his complying with the regulations to be made to secure the rental to the State. The Board, however, declared that they would not perform the plain statutory duty imposed upon them, unless the applicant at one time would pay eight cents per acre, and at another time six cents per acre. An applicant may have been willing to pay even more than the minimum rental fixed by the Legislature, and yet, under the ruling of the Board, after full opportunity for competition had been offered, and no more than one bidder could be obtained, his right to lease the land on the terms prescribed by the Legislature was denied.

We are of opinion that the Land Board had no power to prescribe a minimum rental other than that fixed by the Legislature. It had power to make such regulations as were necessary to carry out the law under which it existed, but it had no power to make regulations inconsistent with the law, and thereby, in effect, for a time to render the law inoperative. It does not follow from this, however, that the leases secured by the appellant are not binding on him.

He states that "I made my applications to the surveyor and they were sent up by him to the Board, and I was notified that the leases were awarded to me and I signed the contracts prepared by them, being the contracts sued on. I did not think that the Land Board had the right to fix the minimum above four cents per acre and I would take chances of getting the lands at the minimum price fixed by the law."

The Land Board had the power to lease the lands to the appellant at the prices offered by them, they being in excess of the minimum fixed by law, and he was under no compulsion to lease the lands.

He signed the lease, thereby obligating himself to pay to the State the rental annually, which, in his application, he proposed to pay.

Had he not agreed to pay the rental named in his applications and in the contracts signed by him some other person might have agreed to lease the lands on the same terms at which he obtained them or on rental exceeding the minimum

fixed by the law, and under such a state of facts we do not see on what ground he can be relieved from the obligations voluntarily assumed by him.

The Land Board may have executed its powers in placing a minimum rental on the lands higher than fixed by law, and it may have been very convenient for the appellant to have control of and right to use the lands that he leased in order that with less expense or to greater advantage he could use other lands owned and leased by him, but these things can not relieve him from his contracts.

He states that there were no competitive bids and this may be so without in any manner affecting the rights of the parties.

It was not necessary under the law that there should be competitive bids; for all that the law required was that opportunity for such bids should be given, and this the regulations of the Board did. One who accepted a lease on the terms offered by himself, he being the sole bidder, it would seem would have no right to complain if neither competition was had nor the opportunity for competition given. The State in such case might be heard to complain.

There is no error in the judgment and it will be affirmed, and it is so ordered.

*Affirmed.*

Opinion delivered June 19, 1888

The above case and eight others, styled and marked as follows: No. 6483—E. J. Gannon v. The State of Texas; No. 6484—T. J. Atkinson v. same; No. 6485—Adams and Holloway v. same; No. 6486—J. B. Wilson v. same; No. 6487—D. W. Barnett v. same; No. 6488—Glidden and Sanborn v. same; No. 6489—Jumbo Cattle Company v. same; No. 6490—A. P. Bush v. same—are dependent on substantially the same facts, were tried on the same issues, present the same questions, and were in this court submitted together. For the reasons and on the grounds set out in the opinion in case No. 6482—M. Z. Smisson v. The State of Texas—the judgment in each of the eight cases above named will be affirmed, and it is so ordered.

*Affirmed.*

Opinion delivered June 19, 1888.