# O. W. GREENE v. J. T. ROBISON, COMMISSIONER OF GENERAL LAND OFFICE.

No. 4761.   Decided June 25, 1928.

(8 S. W., 2nd Series, 655.)

*John J. Hiner, Chas. L. Black* and *Black & Graves,* for relator.

The land having been classified as mineral bearing before the sale to Hickox, the title to the minerals was thereby reserved to the State. Rev. Stats., 1911, art. 5433 (Acts, 1907, p. 490) ; Cox v. Robison, 105 Texas, 426.

The reserved mineral interest constitutes part of the permanent school fund. Rev. Stats., 1911, art. 5433; Const., art 7, sec. 2; State v. Hatcher, 281 S. W., 192; Act of Feb. 23, 1900, Laws, 26th Leg., ch. 11.

The Relinquishment Act of 1919 is unconstitutional and void, because working an impairment of the Permanent School Fund. Rev. Stats., 1925, arts. 5367–5379; Const., art 7, secs. 2, 4, 5.

Under the terms of the Act, the owner becomes the State's agent to sell the entire reserved mineral interest, and, for his service in making such sale, he receives fifteen-sixteenths of such mineral interest. Dallas County v. Land & Cattle Company, 95 Texas, 200; San Augustine County v. Madden, 87 S. W., 1056; Taber v. Dallas County, 101 Texas, 241; Delta County v. Blackburn, 100 Texas, 51; Riggins v. Post, 213 S. W., 600.

It may be true that, in order to secure such "active co-operation" or services as agent, some kind of money compensation or interest in property may be required; but the expense incurred in this connection must be paid out of the General Treasury of the State. No part of it can be paid out of the permanent school fund. Everything that the purchaser of the mineral estate pays or promises to pay, either as bonus money, annual rentals or royalty, constitutes a part of the "proceeds of the sale," (State ex rel. Attorney General v. Hatcher, State Treasurer, 281 S. W., 192), and the gross "proceeds of the sale" must be paid into the State Treasury, to be invested in the securities mentioned in the Constitution. No part of the "proceeds of the sale" can be made to any other person or applied to any other purpose. State v. Hatcher, State Treasurer, supra.

The sums required to be paid, one-half to the State and one-half to the owner of the soil, constitute the consideration passing from the purchaser or lessee for the estate granted to him. The sums of money thus to be paid constitutes the "proceeds of the sale" accruing from the sale of the mineral estate to the purchaser or lessee, and, under the terms of this Relinquishment Act, one-half of the gross "proceeds of the sale" must be paid to the land owner. It is manifest that everything the purchaser or lessee may agree to pay as a part of the consideration for the mineral estate granted to him constitutes the "proceeds of the sale." This has already been determined in State ex rel. Attorney General v. Hatcher. It is manifest, therefore, that, by the terms of this Relinquishment Act, the State receives from the permanent school fund only one-half of the "proceeds of the sale," the other one-half passing to the owner of the soil.

If it be argued, on the other hand, that no title to the relinquished mineral estate passed immediately to the land owners, and that there is no sale of any part of the mineral estate, under the terms of this Act, until a given land owner sells or leases the same as authorized by Section 2 of the Act (Article 5368) then we submit that the Act is clearly unconstitutional, because it appropriates a part of the "pro-

ceeds of the sale" to the land owner, whereas the gross "proceeds of the sale" must be paid into the State Treasury, to become a part of the permanent fund. (Taber v. Dallas County, 101 Texas, 241–248; State ex rel. Attorney General v. Hatcher, State Treasurer, 281 S. W., 192.)

In short, if the Act accomplishes an immediate sale of fifteen-sixteenths of the minerals to the land owner, then it is void because the sale is made for a consideration not warranted by the Constitution. On the other hand, if no immediate interest passes to the land owner and the Act authorizes merely a hiring contract, whereby the owner is employed as agent to sell the land, then it is void because it provides that the compensation of the owner for his services shall be paid out of the "proceeds of the sale."

When we look to all the terms and provisions of this remarkable piece of legislation, we see that, in legal effect, it accomplishes practically a donation to the land owner of a fifteen-sixteenths interest in the minerals.

Article 5372 defines certain grounds of forfeiture of the rights of any purchaser or lessee, and further authorizes the Land Commissioner to declare the forfeiture and to resell the mineral estate in question, and then provides that "the owner of the soil shall not thereby forfeit his interest in the oil and gas." In short, though the land owner secure a purchaser or lessee unwilling or unable to perform the obligations mentioned as required by the Act, still the failure of such purchaser or lessee in no way affects the vested interest of the land owner.

The line of reasoning that may be properly offered in support of the Act of 1917 (now Article 5338 et seq., Revised Statutes, 1925), authorizing mineral permits and leases on lands belonging to the public free school fund and to the University and Asylum funds, is wholly inapplicable. The legislation just referred to authorizes an outright sale of the entire mineral estate. The purchaser is called a "lessee," but he nevertheless acquires full title. (Stephens County v. Mid-Kansas Oil & Gas Company, 113 Texas, 160; State ex rel. Attorney General v. Hatcher, State Treasurer, supra.) All of the consideration received by the State is paid in money.

Under the Act of 1917, everything paid by the purchaser of the mineral estate as a part of the consideration for the grant made to him is paid into the State Treasury and becomes a part of the permanent school fund, whilst, under the terms of this Relinquishment

Act, one-half of the consideration parted with by the purchaser of the mineral estate is paid to the surface owner.

We now direct attention to the requirement of the Constitution that the lands shall be sold "under such regulations at such times and upon such terms as may be prescribed by law," and to the provision of Section 2 (Article 5368) of the Relinquishment Act, which provides that the lands shall be sold "upon such terms as such owner may deem best. We submit without discussion the point presented in the petition that it is not competent for the Legislature, under the Constitution, to devolve upon some private person, not being an officer of the State and not having assumed the obligations of such an officer, the duty and power of executing the State's laws and of performing and discharging a purely State function and State duty.

This Court, in many cases, has determined the constitutionality of statutes in mandamus actions, where the attack on the statute was made by the relator. The following are illustrative cases: Maud v. Terrell, 109 Texas, 97; Reed v. Rogan, 95 Texas, 177; Cox v. Robison, 105 Texas, 426; Pickle v. McCall, 86 Texas, 217. The Court has also considered and determined the constitutionality of statutes where the officer assailed the same. May v. Finley, 91 Texas, 352.

In the recent and important case of State ex rel. Attorney General v. Hatcher, State Treasurer, 281 S. W., 192, the State Treasurer, a ministerial officer, relied upon an unconstitutional statute to justify his action and the statute was considered and held invalid in a mandamus action. Section 9 of the final chapter of the Revised Statutes of 1925 clearly evidences the legislative intent to keep in force laws of the State authorizing the Land Commissioner to sell or dispose of the lands belonging to the public free school fund. The intention of the Codifiers to keep in force the law authorizing the sale of this reserved mineral estate further appears from Article 5345 of the Revised Statutes of 1925.

The Relinquishment Act being void, relator was entitled to a mineral permit, under the Act.

*R. L. Batts,* for respondent Robison, cited and discussed:

Constitution of 1875: Sec. 7, Art. 14, releasing minerals; Sec. 4, Art. 7, relief to purchasers; Sec. 2, Art. 7, perpetual school fund defined; Sec. 5, Art. 7, appropriation of proceeds of school lands; Sec. 6, Art. 7, county school lands.

Statutes of Texas: Rev. Stats., 1879, Art. 3800, releasing minerals; Act of 1883, Chap. 88, April 12, p. 85, minerals reserved; Act of 1883, Chap. 97, April 14, p. 100, reserving minerals; Act of 1895, Chap. 127, p. 197, R. S., 1895, 3498n; Rev. Stats., 1895, Art. 4041, releasing minerals; Act of 1905, p. 148, amending mineral act; Act of 1907, Chap. 20, p. 499, reserving minerals; Act of 1913, Chap. 173, p. 409, minerals lease act; Act of 1917, Chap. 83, p. 158, minerals lease act; Act of 1919, Chap. 81, p. 249; amended 1921 to include unsurveyed lands; incorporated, R. S., 1925; Rev. Stats., 1925, 5367–5382, relinquishment act; Act of 1925, Chap. 71, p. 225, latest minerals lease act.

Decisions: Stephens County v. Mid-Kansas Oil & Gas Co., 113 Texas, 160; State v. Hatcher, 115 Texas, 332; Cox v. Robison, 105 Texas, 426; Smisson v. State, 71 Texas, 235; T. C. R. Co. v. Bowman, 97 Texas, 421; Imperial Irrigation Co. v. Jayne, 138 S. W., 575; Greene v. Robison, 109 Texas, 367; Tomlinson v. Hopkins Co., 57 Texas, 572; Pulliam v. Runnels County, 15 S. W., 278; Dallas County v. Club L. & C. Co., 95 Texas, 200; San Augustine County v. Maddox, 87 S. W., 1056; Reed v. Rogan, 59 S. W., 225; Hazelwood v. Rogan, 67 S. W., 80; Schendell v. Rogan, 63 S. W., 1001; Ayers v. Railroad Co., 88 S. W., 437; Texas Co. v. Daugherty, 107 Texas, 226; Stallcup v. Robison (unreported).

*Hill, Neill & Hill,* for co-respondent Yates.

The constitutionality of the Act approved July 31, 1919, and Articles 5367, 5368, 5338 and 5341, Revised Civil Statutes 1925, can not be questioned by a private party to enforce or claim a private property right by original mandamus suit in the Supreme Court against the Commissioner of the Land Office and the adverse claimant of such private property right, and such action is an attempt to sue the state without its consent. Brownson v. Smith, 93 Texas, 614.

Defendant's title to said land and the mineral rights therein having been acquired by purchase of the land in 1913, and relinquishment of 15/16ths of the mineral in 1919, and the Revised Civil Statutes of 1925, relator is barred of the right to maintain suit therefor, the right of action, if any, being alone in the State. Erp v. Robison, 106 Texas, 146; Pruett v. Robinson, 108 Texas, 283; Herndon v. Robison, 114 Texas, 446.

The law confers no authority on the Commissioner of the General Land Office to issue permits for the development of oil and gas.

on public school lands sold with the reservation of the mineral or mineral rights therein, and the Commissioner properly rejected relator's application for such permit without reference to any other issue in this case. At the date of his application, Chapter 4, Title 86, Revised Civil Statutes, 1925, Subdivision 3, Article 5367–5368, was the applicable law under which a right to develop oil or gas in such land could be acquired, but he applied for a permit under Subdivision 1 of said chapter, Article 5338–5352. Bryan v. Sundburg, 5 Texas, 418; American Indemnity Co. v. Austin, 112 Texas, 249; Hanrick v. Hanrick, 61 Texas, 601; Stirman v. State, 21 Texas, 734.

The Supreme Court is without jurisdiction by an original mandamus suit to adjudicate the title of defendant to the mineral estate in said land. Fitzgerald v. Robison, 110 Texas, 468; Juencke v. Terrell, 98 Texas, 237; Sawyer v. Robison, 114 Texas, 436; O'Keefe v. Robison, 292 S. W., 854.

Relator having no rights in or title to the land or minerals in question when the Act approved July 31, 1919, and the Revised Statutes of 1925 was passed and adopted relinquishing to and vesting in defendant 15/16ths of the minerals therein, is without right of action to attack the constitutionality of that Act and Statute. The right of action, if any, being in the State only. Thompson v. Baker, 90 Texas, 163; League v. DeYoung, 1 Texas, 497; Herring v. Houston National Exchange Bank, 113 Texas, 264; Durrett v. Crosby, 28 Texas, 687; Fitzgerald v. Robison, 110 Texas, 468; Wright v. Kelly, 43 Pac., 565.

The original Act and Articles 5367–5368, Revised Civil Statutes of 1925, are within the constitutional power of Legislature, and vested in defendant as the owner of the soil of the land in question 15/16ths of the oil and gas therein. Imperial Irrig. Co. v. Jayne, 104 Texas, 395; Railway Co. v. Bowman, 97 Texas, 417; Greene v. Robison, 109 Texas, 367; Smisson v. State, 71 Texas, 222.

Briefs were also filed by various counsel appearing in this and the cases following and dependent on its rulings, by leave of the court, as *amici curiae,* on behalf of clients having interests dependent on the rulings herein. They were mostly devoted to attacking or to defending the constitutionality of the, so called, Relinquishment Act. Counsel so appearing were as follows:

*Nelson Phillips; F. A. Williams; T. R. Freeman, S. W. Marshall,* and *John L. Young; T. L. Foster* and *J. W. Timmins; G. B. Smed-*

*ley; Underwood, Johnson, Dooley & Simpson; B. N. & J. S. Gresham; Claude Pollard,* Att.-Gen., and *C. W. Trueheart,* Assistant.

MR. JUSTICE PIERSON delivered the opinion of the court.

This is an original proceeding for mandamus in which relator Greene seeks to have J. T. Robison, Commissioner of the General Land Office, issue to him a permit to prospect for oil and gas on Section No. 36, Block No. 178, Certificate No. 1611, T. C. Railway Company's Survey, containing 640 acres of land, in Pecos County, Texas, under the Permit and Lease Act of 1917.

On the 6th day of August, 1913, said section of land, which by the Constitution of 1876 had been set aside to the public free schools, was awarded and sold to T. F. Hickox classified as "mineral," and was sold with a reservation of the minerals to the State of Texas, in accordance with Article 5433 of the Revised Statutes of 1911. The mineral interest reserved to the State at the time the land was sold remained the property of the State as a part of the public free school land, and was subject to sale by the State for the benefit of the public free school fund, the same as the soil had been. Prior to the time of the filing of relator's application, I. G. Yates, of Pecos County, had succeeded to all of the rights and title of said Hickox. The Land Commissioner rejected relator's application with the following notation: "For reason area not subject to the application. Under Article 5367, R. S. 1925, fifteen-sixteenths of oil and gas in this tract relinquished to owner. Under Article 5338, R. S. 1925, there is no provision for issuance of permit on sold school land."

On November 3, 1926, I. G. Yates, individually and acting as agent of the State of Texas, executed an oil and gas lease on this land to the Plymouth Oil Company.

This is one of six cases involving the constitutionality of an Act of the Legislature, commonly called the Relinquishment Act, embodied in Arts. 5367 to 5382, R. S. 1925, and originally enacted as Chapter 81, Acts Second Called Session of the 36th Legislature, 1919. In four of the cases,—No. 4671, Greene v. Robison et al., No. 4936, Sheldon v. Robison et al., No. 4992, McDaniel v. Robison et al., and No. 4993, Bowen v. Robison et al., the land had been awarded and sold to the owners of the soil prior to the effective date of said Relinquishment Act. In two of them,—No. 4892, Buvens v. Robison et al., and No. 4991, McDaniel v. Robison et al., the land was awarded and sold to the owners of the soil after the effective date of said Relinquishment Act. All of the cases, however, depend

upon and are controlled by the determination of the issue of the constitutionality of said Relinquishment Act.

The Legislature is a co-ordinate branch of the government, created by the people in their Constitution for the especial purpose of enacting the laws under which the government must be administered. The rules and principles to guide a court in determining the constitutionality of its Acts have often been announced and elaborated upon in the cases. We will not repeat them, or review them further than to say that all reasonable doubts will be resolved in favor of the validity of an Act, and that where an Act is susceptible of a valid construction, that construction will be given it. We deem it unnecessary to cite cases.

The Relinquishment Act appears in the Revised Statutes of 1925 as Articles 5367 to 5382, inclusive. We copy in full the first two Articles as follows:

"Art. 5367. School and asylum lands.—The State hereby constitutes the owner of the soil its agent for the purposes herein named, and in consideration therefor, relinquishes and vests in the owner of the soil an undivided fifteen-sixteenths of all oil and gas which has been undeveloped and the value of the same that may be upon and within the surveyed and unsurveyed public free school land and asylum lands and portions of such surveys sold with a mineral classification or mineral reservation, subject to the terms of this law. The remaining undivided portion of said oil and gas and its value is hereby reserved for the use of and benefit of the public school fund and the several asylum funds."

"Art. 5368. Sale and lease by agent.—The owner of said land is hereby authorized to sell or lease to any person, firm or corporation the oil and gas that may be thereon or therein upon such terms and conditions as such owner may deem best, subject only to the provisions hereof, and he may have a second lien thereon to secure the payment of any sum due him. All leases and sales so made shall be assignable. No oil or gas rights shall be sold or leased hereunder for less than ten cents per acre per year plus royalty, and the lessee or purchaser shall in every case pay the State ten cents' per acre per year of sales and rentals; and in case of production shall pay the State the undivided one-sixteenth of the value of the oil and gas reserved herein, and like amounts to the owner of the soil."

Article 5369 provides that if oil should be discovered on land adjoining and within one thousand feet of that included in this Act, the "owner, lessee, sublessee, receiver or other agent in control of

such land included herein," shall, within 100 days, "begin the drilling of an offset well or wells"; and Article 5370 provides upon failure of such person or persons to drill offset wells, "thereupon the relinquishment herein granted shall ipso facto terminate and the rights acquired thereunder shall likewise terminate, and the oil and gas relinquished shall revert to and become the property of the State's general revenue fund."

Article 5371 in part provides:

"Sale of forfeited rights.—When the relinquishment granted herein and the rights acquired thereunder have been so terminated, the Commissioner (of the General Land Office) shall take possession of the land and advertise the oil and gas therein for sale. All such sales shall be made at such times as the Commissioner may determine and in the manner provided for the sale of public free school land. The sale shall be made to the person, firm or corporation that will pay the highest price therefor in addition to one-eighth of the oil and gas produced or the value of the same, which shall be reserved to the public free school fund. The sum received in addition to the reserved one-eighth shall be divided equally between the General Revenue Fund and the owner of the soil, after deducting the expenses incident to the advertisement and sale."

Article 5372 provides that if any person, firm, or corporation fails or refuses to make the payments, reports, etc., as required by the Act, the lease shall be subject to forefeiture by the Commissioner of the General Land Office, and that the oil and gas in said lands shall again become subject to sale as provided in Article 5371, "except that the owner of the soil shall not thereby forfeit his interest in the oil and gas."

Article 5373 in part provides:

"A relinquishment to the State of a lease producing oil or gas in paying quantities shall not operate to relinquish or convey to the owner of the soil any interest whatever in the oil and gas that may be in the land included in said lease."

Articles 5374, 5375, 5376, 5377, and 5378 relate to combination of permits and operations under them.

Article 5379 reads:

"Damages to soil.—The payment of the ten cents per acre and the obligation to pay the owner of the soil one-sixteenth of the production and the payment of same when produced and the acceptance of same by the owner, shall be in lieu of all damages to the soil."

Articles 5380, 5381, and 5382 pertain to the payment of royalty, form of payments, and the lien to secure the State's royalty.

It is contended that the Act is unconstitutional and void, for the following reasons:

1. That it constitutes a donation to the owner of the surface of a part of the permanent free school fund.

2. That it attempts to create an irrevocable agency coupled with an interest in the subject matter.

3. That the Act provides that a part of the permanent school fund may be used to compensate the owner of the soil for services rendered by him, and for damages to his surface rights.

4. Because it creates "an agency with power to fix the conditions, times and terms of sale of public school and asylum lands," in contravention of Section 4, Article 7, of the Constitution.

Section 2 of Article 7 of the Constitution reads as follows:

"All funds, lands and other property heretofore set apart and appropriated for the support of public schools, all the alternate sections of land reserved by the state out of grants heretofore made or that may hereafter be made to railroads, or other corporations, of any nature whatsoever, one-half of the public domain of the state, and all sums of money that may come to the state from the sale of any portion of the same, shall constitute a perpetual public school fund."

Section 4 of Article 7 provides:

"The lands herein set apart to the public free school fund shall be sold under such regulations, at such times, and on such terms as may be prescribed by law; and the legislature shall not have power to grant any relief to purchasers thereof. The Comptroller shall invest the proceeds of such sales, and of those heretofore made, as may be directed by the Board of Education herein provided for, in the bonds of the United States, the State of Texas, or counties in said State, or in such other securities and under such restrictions as may be prescribed by law; and the State shall be responsible for all investments."

Section 5 of Article 7 provides:

"The principal of all bonds and other funds, and the principal arising from the sale of the lands hereinbefore set apart to said school fund, shall be the permanent school fund; * * * and the available school fund shall be applied annually to the support of the public free schools. And no law shall ever be enacted appropriating any

part of the permanent or available school fund to any other purpose whatever;" * * *

The two leading Articles of the Act, Nos. 5367 and 5368, are assailed most vigorously as being unconstitutional, as making a gift, as constituting an unauthorized diversion of a part of the school fund, and as delegating to an agent duties imposed by the Constitution upon the Legislature. Of course all parts of the Act must be construed together, as is admitted. In his brief vigorously attacking the validity of the Act the able Attorney General, as *amicus curiae*, after reviewing these two Articles, says:

"Some of the others though throw light upon the three questions presented, viz: Whether the Act makes a donation of an interest in the mineral estate to the owner of the soil; whether, if not, a consideration provided for in the sale of such interest to him is services rendered by him in making lease; and whether, lastly, if it does not create a present grant of such interest to him but merely creates a power of sale, it delegates to him the legislative function of prescribing the times, terms, and regulations of sale."

We concur with the view expressed by Mr. Black, the able attorney for relator, that the Act does not authorize or effect a sale to the owner of the soil, but that "the intention of the Legislature was to utilize the co-operation and services of the surface owner in the sale of the reserved mineral estate—to use him as an intermediary in the sale." The purpose of the Act was disclosed in Section 1 of the original Act of 1919, as follows: "To promote the active co-operation of the owner of the soil and to facilitate the development of its oil and gas resources."

We think the Act, as it says in Article 5367, creates the owner of the soil the State's agent for the purposes mentioned therein. For the accomplishment of those purposes, said agent is authorized, "to sell or lease * * * the oil and gas * * * upon such terms and conditions as such owner may deem best, subject only to the provisions" of the Act. There is no vesting of title or interest in the oil and gas in the owner of the soil. No rights pass to anyone until a sale or lease is effected according to the terms of the Act. What is sold, the consideration therefor, the provisions inuring to the benefit of the owner of the soil, what are the proceeds of the sale, and their application, must all be determined from the Act.

The expressions in Article 5367 that the State "relinquishes and vests" in the surface owner fifteen-sixteenths of the oil and gas, and that the remaining portion is "reserved" for the benefit of the school

and asylum funds, are confusing and uncertain of meaning, and perhaps not of importance. But when taken in connection with the provision that "the owner of the land is authorized to sell or lease * * * the oil and gas that may be-*thereon or therein,*" and the special provisions for payments to be made to the State and to the owner of the soil, and the manner of the payments, we think the Act clearly contemplated the sale or lease by the agent of all the oil and gas, and that the reserved one-sixteenth should be considered a royalty. This one-sixteenth is referred to generally throughout the Act as a royalty. The fifteen-sixteenths mentioned, as well as and together with the one-sixteenth, were to be dealt with by the agent under and *"subject to the terms of the law,"* and was, of course, all the oil and gas in the land. All the oil and gas was to be sold and pass to the purchaser or lessee, subject to the provisions of the Act,—subject to the one-sixteenth or such royalty as may be secured under the terms of the Act; the sale being conditioned also by the other provisions of the Act regarding satisfaction to the owner of the soil for the use of or the taking of his property. That there was no gift or donation to such owner of a part of the oil and gas, is borne out by all the subsequent provisions of the Act. The concluding sentence of Article 5373 stipulates that "a relinquishment to the State of a lease producing oil and gas in paying quantities shall not operate to relinquish or convey to the owner of the soil any interest whatever in the oil and gas that may be in the land included in said lease"; thus directly indicating that the owner of the soil should have and receive no benefits other than the amounts as provided in Article 5368. The concluding words of Article 5368 provide that "like amounts" as received by the State shall be paid "to the owner of the soil." Also, Article 5379 provides:

"The payment of the ten cents per acre and the obligation to pay the owner of the soil one-sixteenth of the production and the payment of same when produced and the acceptance of same by the owner, shall be in lieu of all damages to the soil."

There would be no reason whatever for making these specific provisions for the owner of the soil if the Act had already vested in him, or intended that he should ever have, fifteen-sixteenths of the oil and gas.

We cannot agree with respondent, the Land Commissioner, and his attorney, that the Legislature has authority to relinquish to the owner of the soil, *without payment of consideration therefor,* min-

erals reserved to the State prior to the sale of the land and withheld in his purchase thereof; or that the cases of Cox v. Robison, 105 Texas, 426, 150 S. W., 1149, and Greene v. Robison, 109 Texas, 367, 210 S. W., 498, can be so construed.

But relator says that if there was not a donation to the owner of the soil of a part of the oil and gas, there was at least a donation to him of a part of the proceeds of their sale, or compensation to him for his services out of their proceeds, diverting from their purpose a part of the public school fund. His proposition in the first instance is that the proceeds of a sale of property are all the purchaser pays for it, and that the provision that "like amounts shall be paid to the owner of the soil," effects a gift or compensation to said owner out of the school fund. This would be true if that were the purpose and effect of the Act, and if the Legislature were merely a trustee, a sales agent making sales of these lands.

The State as a sovereign, through the Legislature, is charged with selling these lands. The sovereign people preferred a country of independent homes, of independent citizens, to a feudal system, and therefore in their Constitution provided for the sale of its vast domain of public lands. The Legislature provided for their sale to homesteaders only, with requirement of occupancy. Also it provided that they should be leased for periods of years. It also granted permanent easements over them for railroad rights of way, and for irrigation systems and sites for water reservoirs, covering hundreds of acres. These Acts were vigorously attacked on the same grounds as urged here, but in well reasoned opinions were all upheld. Smisson v. The State, 71 Texas, 222, 9 S. W., 112; Texas Central Ry. Co. v. Bowman, 97 Texas, 417, 79 S. W., 295; Imperial Irrigation Co. v. Jayne, 104 Texas, 395, Ann. Cases, 1914 B 322, 138 S. W., 575.

In Greene v. Robison, 109 Texas, 367, 210 S. W., 498, this Court said:

"While these lands were by the Constitution dedicated to the school fund, the school fund acquired no title to them as against the State. The State did not thereby become a mere trustee. As the sovereignty, it continued to own the lands just as fully as before their dedication. This has been definitely settled. Chief Justice Stayton settled it in Smisson v. State, 71 Tex. 229, 9 S. W., 112. See also Imperial Irrigation Co. v. Jayne, 104 Tex. 395, 138 S. W., 575, Ann. Cas. 1914 B, 322."

The Legislature has sovereign powers to deal with the school lands and to administer them as the public weal and welfare may dictate, subject only to the express limitations of the Constitution.

Now let us examine the Act and ascertain the intention of the Legislature with regard to the sale of the oil and gas by the State, and the consideration accruing to the State for the sale, and also with regard to certain payments required by the Act to be made to the owners of the soil. The Act provides that the purchaser of the oil and gas shall pay to the owner of the soil "like amounts" that he shall pay to the State; and construing this provision in connection with the provision of Article 5379, that such payments shall be "in lieu of all damages to the soil," and having in mind some of the provisions of the original Mineral Sales Act passed in 1913, it was evidently the intention of the Legislature that such amounts as provided to be paid to the owner of the soil were not intended or considered to be a part of the consideration for the sale of the oil and gas. This was a legislative provision for the protection and benefit of the owner of the soil, and such amounts were to be paid by said lessee or purchaser of the oil and gas out of his purchase. The Act of 1913 we believe was the first Act providing for a sale of oil and gas under public land sold with a mineral reservation. It is provided therein that "the owner of the * * * lease shall pay to the owner of the surface of the land twenty cents per acre per annum in advance during the life of the lease," and when paid shall be "in full compensation for all damages to such surface by reason of the ingress and egress and operation necessary to the development and the operation under the lease." Said Act provided that "if the owner * * * of the surface will not accept the payment of twenty cents per acre per annum as above provided, and the lessee of the mineral rights cannot agree with such owner * * * of the surface rights on the compensation to be paid for the use of (or) the damages to such surface rights, *then the right thereto * * * may be acquired by condemnation* as hereinafter provided." (Italics ours.) The Act provided for condemnation according to the law relating to condemnation of rights of way for railways. The succeeding Act of 1917, under which relator seeks a permit, provided that the purchaser of the oil and gas should pay to the surface owner ten cents per acre per annum. The Legislature recognized the justice of protecting the purchaser of the soil and its authority and duty to make provision therefor, but the provisions made were wholly inadequate. Those in the 1917 Act amounted

ot nothing. Under these first Acts, with the exception of a very few favored localities adjacent to proven territory, no results were had.

There are two observations pertinent to these Acts, including the Act under consideration: (1) That the compensation for the use of and the taking of the surface for oil development and operation is to be paid by the lessee out of his purchase; (2) that no real adequate compensation prior to the Relinquishment Act was provided to the surface owner, unless the provision for condemnation under the Act of 1913 provided it. This provision, however, was eliminated in the 1917 Act. Therefore, the very first words of this Mineral Act of 1919 disclosed that one of the purposes of the Act was "to promote the active co-operation of the owner of the soil." This calls attention to the conditions that made it desirable to secure the co-operation of the owner of the soil. The State had sold the land, the soil with all that goes with it, to the purchaser thereof, and was under obligation to protect him in the use and enjoyment of what it had sold him; and this the State had failed to do.

There was a dual or double ownership of the land, the surface estate and the mineral estate, each antagonistic to and conflicting with the other. There was no provision of law for the protection of the owner of the soil in his peaceable enjoyment and possession of his property. The development of an oil field on it would be disastrous to him and utterly destructive of his property. Therefore the attitude of owners of the school and asylum lands throughout the State was practically one of armed resistance. The conditions were inimical to any effort at development, and the State was not realizing on its mineral estate in these lands. The purpose of the Act was to meet this practical situation. Indeed, the rights of possession and user of the land as a whole by both the owner of the soil and the owner of the minerals, they being joint owners of the land, are mutual and blended. As in other joint ownerships, necessarily there must be co-operation. If the joint owners do not co-operate, confusion is bound to arise, the purposes and efforts of each are jeopardized and destroyed, and the State suffers loss, not only to its mineral estate, but likewise as a sovereign in the administration of justice. The Legislature has brought about this desired result in a lawful manner by requiring the purchaser of the oil and gas to compensate the owner of the soil for the use he makes of the surface, independent of the price he pays for minerals. He compensates said owner for the inevitable damages of oil exploration and operation. The land owner acquires no estate in the oil and

gas. He simply has a right to receive the compensation from the lessee out of the lessee's production as the statute provides.

The payments to be made to the owner of the surface "in lieu of all damages to the soil" is a matter of interest primarily to the land owner and the oil operator. It is the oil operator who injures or destroys the owner's land. But the State is also interested as a sovereign doing justice between its citizens and also as the vendor to the land owner.

The provision that the payment of the ten cents per acre per annum and the one-sixteenth of the production shall be "in lieu of all damages to the soil" shows clearly that same was not regarded as a part of the consideration for the sale of the oil and gas.

It becomes unnecessary for us to decide whether or not the Legislature in the sale of the oil and gas in these lands could have protected the owner of the soil and have secured to him that which he had bought from the State, by providing that he should receive a part of the oil and gas,. or their proceeds, or to decide whether he could be compensated for services in selling them out of the proceeds of the sale. Therefore it is the reasonable, and we think the correct, interpretation of the Act that the provisions for payments to him of like amounts paid to the State are not a division of the proceeds of the sale of the oil and gas, but an Act of the Legislature, in the exercise of its sovereign law-making powers, making just and equitable provision for protecting its citizens in their property rights it sold them.

It is vigorously contended by able counsel for relator, and attorneys as *amici curiae,* that the Act authorizes the agent, the owner of the soil, to fix the terms under which the oil and gas shall be sold; that in addition to the ten cents per acre per year for the State, plus a one-sixteenth royalty and ten cents per acre per year for the owner of the soil, plus a one-sixteenth of production, the owner of the soil, as agent of the State, is authorized to sell the oil and gas in the land for such additional amounts as he may be able to get; that he may demand "one-sixteenth or two-sixteenths" or any per cent. above the minimum provided in the Act, and an additional or large bonus, and that this authority in him is in contravention of Section 4, Article 7, of the Constitution.

As pointed out, the Act provides that the owner of the land, as agent of the State, is authorized to sell or lease the oil and gas "upon such terms and conditions as such owner may deem best, subject only to the provisions hereof"; and that "no oil or gas rights

shall be sold or leased hereunder for less than ten cents per acre per year plus royalty, and the lessee or purchaser shall in every case pay the State ten cents per acre per year of sales and rentals," and one-sixteenth of the value of the oil and gas in case of production, and "like amounts to the owner of the soil." (Art. 5368.)

Section 2 of the original Act of 1919, which became Article 5368 R. S. 1925, contained a provision that all sales or leases "shall, as respects the rental to be paid, be made for and inure to the benefit of the State *to the extent herein provided.*"

We interpret the Act to fix a minimum price of ten cents per acre per annum and the value of one-sixteenth of the gross production free of cost to the State, for which the State is willing to sell the oil and gas, and the agent is authorized to secure the highest price obtainable for the benefit of the fund to which the land belongs,—like amounts received by the State to be paid by the purchaser to the owner of the soil. If a bonus is paid, if a larger royalty or other amounts are contracted for, the State and the owner of the soil receive equally in like amounts.

In cases of forfeiture of producing leases, the Act, in Article 5371, again provides a minimum, and directs the Commissioner of the General Land Office to resell the oil and gas in the land "to any person, firm or corporation that will pay the highest price therefor in addition to" the minimum fixed therein. Whether or not this is a wise policy is for the legislative judgment, not the courts, provided that such authority of the agent to secure a price above the minimum fixed by the Act is not a violation of said Section 4, Article 7, of the Constitution.

The pertinent part of said Section is: "The lands herein set apart to the public free school fund shall be sold under such regulations, at such times, and on such terms as may be prescribed by law."

The expression "on such terms" is interpreted to refer to the consideration or price for which the lands are to be sold, and the time and manner of its payment. This expression of the Constitution has never been construed to require that the Legislature should prescribe in detail and with exactness the consideration or price for which these lands should be sold, but from the adoption of the Constitution of 1876, which set aside these lands to the school and asylum funds, and enacted this provision of the Constitution, down to the present time, the fixing of a minimum price by the Legislature and the authorization of the Commissioner of the General Land Office, the Land Board, or the "person selling," to secure the best

obtainable price, has been considered a compliance with said constitutional provision.

The Constitution, in Section 12 of the same Article, uses the same language in providing for the sale of the lands set aside to the University of Texas. Chapter 3, Title LXXXI, of the Revised Statutes of 1879, which were codified under an Act passed by the Legislature of 1876, provided that the public free school and asylum lands, and those set aside to the University of Texas, should be sold "for their real value, but in no case for a less price than one dollar and fifty cents per acre," and provided for commissioners to be appointed to value said lands in accordance with the Act.

A comprehensive law, which put into operation these provisions of the Constitution of 1876, relating to the sale of the University, the public free school, and the asylum lands, was enacted in 1883 by the 18th Legislature. This Legislature was composed of many able statesmen who had been members of the Constitutional Convention of 1876, and who had participated in the preparation of the Constitution. They participated in and voted for the passage of this Act. Section 4 of said Act provided: "Said land shall, in no case be sold for less than two dollars per acre for surveys of land without water on them or bordering on them, nor for less than three dollars per acre for land with permanent water on them or bordering on them, nor less than five dollars per acre for land having timber thereon suitable for lumber, nor for less than two dollars per acre for land having timber thereon not suitable for lumber and classed as timbered lands."

Section 6 provided that "the lands, when placed upon the market, shall be sold in the county or land district in which it is situated, by such authority and under such *system of competition* as may be prescribed by said Land Board." (Italics ours.)

It was provided in Section 8 that "the person having authority shall sell the same to the highest and best bidder," and "no bid shall be received at a less sum than the minimum price fixed by law."

In Section 11 it was provided that "the person authorized to make sales shall receive such obligations for the State and account for the money and notes received by him at such times and in such manner as may be prescribed by the board."

It was also provided in Section 17 of the Act that the "expenses of selling and leasing the School, University, or the Lunatic, Blind, Deaf and Dumb, or Orphan Asylum lands shall be paid out of the

proceeds of the sales and leases, except that paid by the purchaser under such regulations as the said board may prescribe."

The emergency clause provided that the fact that there was no law authorizing the sale of the lands "for a sufficient price under fair competition" created an emergency, etc. These provisions, with little change, and always to the same effect, were continued and brought on down through all the statutes to the present time. They are contained in Articles 4218b et seq. of the Revised Statutes of 1895, and in Articles 5405 et seq. of the Revised Statutes of 1911, and in Articles 5306 et seq. of the Revised Statutes of 1925.

The present University Mineral Sales Act and the Mineral Sales Act under consideration both contain similar provisions. The University Act, in Article 5343, after fixing the minimum, provides that the oil and gas shall be sold or leased for a minimum price, and in addition thereto, "such sum, if any, that one may pay therefor as provided herein."

Contemporaneous construction of a constitutional provision by the Legislature is entitled to great weight, especially where such construction dates back for half a century and has been followed without question since. It is not necessary, we think, to hold that this provision of the Constitution requires the Legislature to fix a hard and fast rule, or set of terms and prices, for which the lands must be sold,—an inflexible and fixed price, regardless of changing conditions and developments. We are constrained to hold that a sale of these minerals for the best price obtainable by the owner of the soil, the Legislature having prescribed a minimum as the terms upon which the State is willing to part with them, is valid and in compliance with the Constitution.

There can be no doubt that the State may sell these lands through the form of an ordinary gas and oil lease upon a royalty basis. The terms of the lease as to the minimum royalty, and other provisions of consideration, the time of payment, and the agency or agencies through which the sale is accomplished, are within the legislative discretion. Through the owner of the soil, as its agent, the State continuously offers for sale the oil and gas under the public free school and asylum lands.

A sale or lease by the State is subject to the same rules of law that are applied to ordinary business or commercial leases. In the absence of an express provision, there is an implied covenant for exploration, development, and operation. Freeport Sulphur Co. v. American Sulphur Royalty Co., not yet reported (p. 439 ante, 6

S. W., 2d series, 1039) ; and upon abandonment of the property for the purposes of the lease, the oil and gas reverts to the vendor or lessor, as was held in the cases of Grubb v. McAfee, 109 Texas, 527, 212 S. W., 464, and Texas Co. v. Nelson Davis, 113 Texas, 321, 254 S. W., 305.

There are certain provisions of the Act, which do not affect its validity or practical operation, which are clearly void.

In Article 5370, after providing for a forfeiture for failure to drill offset wells, it is provided: "The oil and gas relinquished herein shall revert to and become the property of the State's general revenue fund."

In Article 5371, after providing that the oil and gas so forfeited shall be sold to the highest bidder, etc., it is provided: "The sum received in addition to the reserved one-eighth shall be divided equally between the General Revenue Fund and the owner of the soil."

The oil and gas belong to the State for the benefit of these various funds, and their proceeds must go where the Constitution provides.

The wide difference of opinion as to the validity of the Act is due in a large measure to the confusion in the Act itself, as well as to the widely divergent views of the legislative authority over these lands. The provisions regarding the execution of the lease are rather indefinite. Perhaps all these functions could be better performed directly through the General Land Office, as all administration under the lease after its execution, as provided by the Act, must come under and through the supervision of the Commissioner.

In addition to the able counsel representing the relators and respondents in these cases, many other able attorneys have filed arguments on both sides of the questions involved. Mindful of the importance of the questions involved and of the far-reaching effect of our decision, we have given this and the other cases our most careful and mature consideration.

Our holdings herein having disposed of all the issues affecting the validity of the so-called Relinquishment Act, and believing that said Act is a valid enactment, and all other issues being immaterial, the application of relator for mandamus is denied.