## SHELL PETROLEUM CORPORATION v. TIPPETT.

### No. 8380.

Court of Civil Appeals of Texas. Austin.

March 3, 1937.

Rehearing Denied March 31, 1937.

Thompson, Mitchell, Thompson & Young, of St. Louis, Mo., P. G. McElwee, of Jefferson, and A. E. Groff, of Houston, for appellant.

Harris & Harris and M. E. Sedberry, all of San Angelo, for appellee.

Turner, Rodgers & Winn, of Dallas, amicus curiæ.

McCLENDON, Chief Justice.

Suit by Shell (Shell Petroleum Corporation) against Tippett (J. H. Tippett, individually and as community survivor and community administrator of the estate of

Laura Tippett, deceased) to recover one-half the bonuses and deferred rentals (less 10 cents an acre) paid by Shell (then operating under the corporate name of Roxana Petroleum Corporation) to Tippett (in his said several capacities) under two leases executed by Tippett to Shell under the Relinquishment Act (articles 5367 et seq., R.C.S., and amendments thereto [Vernon's Ann. Civ.St art. 5367 et seq.]); which sums had been subsequently paid by Shell to the state in satisfaction of a judgment.

Shell's suit was predicated upon three theories of recovery:

1. Tippett's general warranty contained in the leases.

2. Reimbursement for money paid to Tippett under mutual mistake.

3. Subrogation to the state's right of recovery against Tippett.

The trial was to the court without a jury upon an agreed statement of facts; and the judgment was in favor of Tippett upon findings and holdings to the effect that there was no breach of warranty or right of subrogation, and that the action for mutual mistake was barred by the two and four years' statutes of limitations (Vernon's Ann. Civ.St. arts. 5526, 5527), the mistake having or should have been discovered and the right of action therefore having accrued in 1928, when the Supreme Court handed down its decision in Greene v. Robison, 117 Tex. 516, 8 S.W.(2d) 655, 660.

The controlling facts follow:

The two leases were on identical forms, differing only as to their dates (August 29, 1925, and February 15, 1927), amounts of bonuses ($804 and $10,440), amounts of deferred rentals ($101.75 and $236), and property covered by the leases. "J. H. Tippett, individually, and as survivor in community of the Estate of Laura Tippett, deceased, and as agent of the State of Texas," was "party of the first part, and hereinafter called lesssor (whether one or more)." The lessee was the Roxana Petroleum Corporation (now Shell). The pertinent portions of the leases follow (amounts taken from the first lease): "The said lessor, for and in consideration of the Eight Hundred Four ($804.00) Dollars, cash in hand paid, receipt of which is hereby acknowledged, and of the covenants and agreements hereinafter contained on the part of lessee to be paid, kept and performed, has granted, conveyed, demised, leased and let, and by these presents do grant, convey, demise, lease and let unto the said lessee, for the sole and only purpose of mining and operating for oil and gas and of laying pipe lines and of building tanks, powers, stations and structures thereon to produce, save, and take care of said products, all that certain tract of land * * *. One-half of the Oil and Gas royalty reserved herein is payable to lessors and one-half to the State, as provided by law and Lessee is hereby authorized to deduct the Annual Rental of ten cents per acre due the State from the delay rentals and pay such rentals direct to the State."

The deferred rentals, other than the 10 cents per acre to the state, must be paid or tendered to "the lessor or to the lessor's credit in the San Angelo Bank."

The warranty clause reads: "Lessor hereby warrants and agrees to defend the title to the lands herein described, and agrees that the lessee shall have the right at any time to redeem for lessor, by payment, any mortgages, taxes or other liens on the above described lands, in the event of default of payment by lessor, and be subrogated to the rights of the holder thereof."

The entire bonus and deferred rentals (except the 10 cents per acre per annum to the state) were paid to and accepted by Tippett, as acknowledged and provided in the lease contracts. These deferred payments on the second contract covered the years 1928, 1929, 1930, and 1931. Greene v. Robison was decided by the Supreme Court June 25, 1928. Shortly thereafter the Attorney General brought suit against Empire Gas & Fuel Company and Tippett to recover one-half the bonuses and deferred rentals on leases similar to those in issue. In that suit the state recovered a joint and several judgment against the Empire and Tippett, and the former recovered over against the latter to the extent it might be required to pay the judgment. This judgment was affirmed by this court October 9, 1929 [Empire Gas & Fuel Co. v. State, 21 S.W.(2d) 376], and by the Supreme Court February 24, 1932 [121 Tex. 138, 47 S.W. (2d) 265]. The state brought suit against Shell for one-half of the involved bonuses and deferred rentals February 17, 1933, recovered judgment therefor July 12, 1933, and Shell paid the judgment August 10, 1933. This suit was brought January 24, 1934.

It is apparent and in effect conceded that the alleged cause of action or ground of recovery predicated (1) upon warranty and/or (2) upon subrogation was not barred

by either the two or four years' statutes, since such cause of action did not accrue until the state's judgment against Shell had been recovered and satisfied; and that if the cause of action predicated upon mutual mistake arose upon the Supreme Court's decision in Greene v. Robison, it was barred by the statutes of limitation of two or four years (one or both, which is unimportant). The controlling questions for decision therefore are whether (1) a cause of action (a) upon breach of warranty, or (b) upon subrogation, was shown; and (2) when the cause of action upon mutual mistake arose.

Except as regards the effect of the decision in Greene v. Robison as notice to Shell of the existence of mistake in the payments to Tippett instead of to the state (which we will discuss later), the issues involved in the three causes of action or (more properly) grounds or theories of recovery involve a proper analysis of the lease contracts when construed in the light of the Relinquishment Act as interpreted by the decisions in Greene v. Robison and Empire Gas & Fuel Co. v. State. They are therefore so interrelated as to warrant their consideration together. At the outset, we state substantially Tippett's analysis of the relations and obligations thus created, as follows:

■■ Regardless of what the parties may have construed their rights to be under the Relinquishment Act, the entire title to the minerals was in the state for the benefit of the school fund. Tippett, as owner of the land other than the mineral estate, was the authorized agent of the state to lease that entire estate upon a stated minimum annual rental and royalty. As compensation for his co-operation as owner of the land and services in making the lease he was entitled to receive one half the bonus, deferred rentals and royalties, the other half being payable directly to the state at Austin. He had no authority as agent of the state or otherwise to receive the state's portion of these sums, the payment whereof to him, however innocently and honestly made and received, was nevertheless unlawful. His warranty in so far as the mineral estate was concerned was only that as agent of the state, a warranty which he was authorized to make under the Relinquishment Act. This latter is predicated upon the statutory effect of the technical words of conveyance employed in the Relinquishment Act. There was no breach of warranty because the title he conveyed was perfect, subject to no defeasance or incumbrance so far as he was concerned for the reason that the implied obligation of Shell to pay the involved sums to the state arose under the obligations imposed upon, and therefore impliedly assumed by, Shell as part of the consideration for the lease. To use Tippett's language: "The necessary elements of a cause of action for breach of warranty can exist only when the title fails, or is encumbered by a lien outside of the grantee's own purchase money indebtedness. If the parties wrote the leases in such manner as that when lessee has paid the purchase money according to the real, express terms of the contract his title is good and clear of encumbrances, no cause of action can arise for breach of warranty."

The payment to Tippett was therefore a mere wrongful payment to one not authorized to receive it, and the obligation to pay the state still existed under the terms of the lease as construed in the light of the Relinquishment Act under which it was executed. Nor was there any right of subrogation for the reason that the state's rights against Shell and Tippett were alternate and not concurrent. The payment of the state's money to Tippett was an unauthorized payment to its agent; and the state was put to an election of inconsistent rights—either to repudiate the payment and sue Shell (which it did), or to ratify the unauthorized act and sue Tippett, its agent, thereby releasing Shell. It could not do both.

The general principles of law invoked in this analysis are elementary, and citation of authority is unnecessary. It is only in their application that we are unable to concur.

■■ The execution of each lease, that is its signing and delivery by Tippett and acceptance by Shell, the payment to and acceptance of the entire bonus by Tippett, and the unqualified obligation to make the entire deferred rental payments (less the state's 10 cents per acre per annum) to Tippett, constituted a single transaction in which Shell and Tippett jointly and actively participated. It was the manifest intention of the parties, as expressed in the instrument, to vest in Shell a terminable fee-simple estate in the minerals, unincumbered and indefeasable, except as in the instrument provided. Tippett, in the several capacities in which he purported to act, expressly warranted such title. In the opening paragraph of the instrument, he stated such several capacities, and that he would thereafter be referred to as "lessor (whether one or

more)." In the warranty clause the "lessor hereby warrants and agrees to defend the title \* \* \* and agrees that the lessee shall have the right at any time to redeem for lessor, by payment, any \* \* \* liens on the above described lands." The import of this language is not open to construction. It is a guaranty to Shell that Tippett had authority, in one or more or all the capacities in which he acted, to make the very agreement which the language of the lease imported; that by paying to him the entire bonus and deferred rentals (except those expressly agreed to be paid to the state) Shell would acquire the unincumbered fee title to the minerals, subject to the conditions and obligations of the lease. We think it unimportant whether the parties construed the Relinquishment Act as vesting fifteen-sixteenths of the mineral estate in the landowner, or as merely compensating the landowner for his services, co-operation, and injury to his land. The parties clearly construed the act as giving or relinquishing to the landowner the entire bonus and deferred rentals other than the 10 cents per acre per annum; and that the payment of such sums to the landowner was in compliance with the act. Whether Tippett was authorized to warrant the title so as to bind the state is not important since not involved here. He acted in each named capacity and in so far as his authority extended, he bound himself in each capacity. His warranty of an unincumbered title was clearly breached in that the state's money was paid to and accepted by him, whereby a lien existed in favor of the state to secure such sums. True the law imported into the lease an obligation of Shell, secured by lien, to pay to the state its portion of the lease money. Consequently as to such sums there could be no breach of warranty so far as the state was concerned. But the warranty was by "lessor"; and the "lessor" was Tippett individually and as community survivor (as well as agent of the state). This warranty clearly bound him individually and as such survivor to make good any deficiency in the title he expressly purported to convey. This deficiency arose from the express terms of the lease under which he received and receipted the state's part of bonus as his own and contracted to have paid to him as his own the state's part of the deferred rentals. The cause of action for this breach of warranty arose when Shell paid the state and thereby discharged the incumbrance. In the Empire Case the judgment over against Tippett was affirmed upon the express holding that he was liable on his warranty.

▮ The right of subrogation also follows from the relation of the parties as adjudicated in the Empire Case. There it was held that the liability to the state of the Empire (Shell here) and Tippett was a joint and several one; and a joint and several obligation. Such judgment could not be sustained upon Tippett's analysis of the transaction that the state's rights against him and Shell were alternative and not both joint and several. The holding that they were joint and several results from the nature of the transaction; that it was a single transaction in which all three (Shell, Tippett, and state) were parties; that two of those parties (Shell and Tippett) jointly and severally diverted the state's money to Tippett. For this they were both liable, jointly and severally, and the state had its cause of action against both or either, as it might choose. Of course it could have but one satisfaction. This holding makes applicable the elementary principle of law thus announced in the Proposed Final Draft of the American Law Institute, Restatement of Restitution and Unjust Enrichment, part 1, § 76, p. 86: "A person who, in whole or in part, has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other, is entitled to indemnity from the other, unless the payor is barred by the wrongful nature of his conduct."

The duty or obligation rested upon both Shell and Tippett to pay the sums due the state. As between the two, however, the primary obligation rested upon Tippett. He could no more discharge that obligation by paying the sums to Shell, either voluntarily or in satisfaction of a judgment, than could Shell discharge its obligation by paying the sum to Tippett. The principle involved here is one of indemnity; and the right to indemnity does not arise until the obligation is discharged by the one (as between the two) secondarily liable. A complete answer by Tippett to a suit by Shell before it had paid the state would be: True, as between us, I owe the duty to discharge the obligation to the state; but I also am bound to the State to discharge that obligation; I cannot discharge it by payment to you; therefore, before your right to such payment (your cause of action against me) accrues, you must discharge the obligation which I owe the state. Whether, therefore, the right to reimbursement be predicated

upon the theory of subrogation or indemnity or both, such right did not accrue until Shell paid the state and is not barred by either the two or four years' statute of limitation.

We are also of the view that discovery of the mutual mistake, and consequent accrual of the cause of action or right of recovery based thereon, did not arise upon the Supreme Court's decision in Greene v. Robison. The holding of the trial court to that effect is predicated upon the following quotation from the opinion in that case: "We interpret the act to fix a minimum price of 10 cents per acre per annum and the value of one-sixteenth of the gross production free of cost to the state, for which the state is willing to sell the oil and gas, and the agent is authorized to secure the highest price obtainable for the benefit of the fund to which the land belongs; like amounts received by the state to be paid by the purchaser to the owner of the soil. If a bonus is paid, if a larger royalty or other amounts are contracted for, the state and the owner of the soil receive equally in like amounts."

The issue is not solely whether the quoted language constituted an adjudication of the issue; but whether reasonably prudent attorneys, representing the respective parties, were warranted in construing the decision as not adjudicating that issue. The Relinquishment Act was manifestly obscure in a number of respects. Some of the ablest lawyers in the state widely differed in its proper interpretation. Greene v. Robison was an original mandamus proceeding brought in the Supreme Court to test the validity of the act. The above quotation from the opinion might well have been construed as dictum. The specific issues here involved were clearly not involved there. The concluding paragraph of the opinion reads: "Our holdings herein having disposed of all the issues affecting the validity of the so-called Relinquishment Act, and believing that *said act is a valid enactment, and all other issues being immaterial,* the application of relator for mandamus is denied." (Emphasis ours.)

Manifestly both Shell and Tippett did not regard the decision as conclusive of the question whether the landowner was entitled to all the bonus and deferred rentals other than the 10 cents per acre payable to the state. Shell continued to pay and Tippett continued to receive all of the deferred rentals on the second lease for the years 1928, 1929, 1930, and 1931, which accrued subsequently to the Greene v. Robison decision. Tippett strenuously resisted the state's right to collect half of these sums in the Empire Case on the ground that he was entitled to all of these sums. In 1931 (Vernon's Ann.Civ.St. art. 5368a), after this court had affirmed the judgment in the Empire Case, and while it was pending on writ of error granted in the Supreme Court, the Legislature attempted to clarify the Relinquishment Act and confer upon the landowners the right to all the bonus and deferred rentals over the 10 cents per acre per annum. The emergency clause of the act recites: "The fact that continuously after the enactment in 1919 of Chapter 81, General Laws of the 36th Legislature, commonly known as the Relinquishment Act, said Act was construed by the General Land Office, by the land owners and the legal fraternity of Texas as vesting title to 15/16 of the oil and gas in said land to the owner of the soil, with the reservation to the State of only 1/16 of the oil and gas as a royalty, and the further fact that numerous contracts have been made by the owners of the soil relating to the development of the mineral in said land, which contracts have been based on the foregoing construction of said law, and the further fact that said construction has become a rule of property between citizens, based on their belief in the good faith of the State, as expressed by the Legislature and the heads of Departments; and for the State to disturb conditions now would lead to endless litigation and destroy many industries, and confuse numerous land titles, and force many of the citizens into bankruptcy, and would prevent and delay the development of the mineral lands of this State, thereby causing the public school fund to lose much revenue, all create an emergency." Chapter 23, p. 28, Gen. Laws Reg.Sess.42nd Leg.

This recitation clearly shows that heads of state departments as well as able lawyers had interpreted the Relinquishment Act other than as finally construed by the Supreme Court in the Empire Case. It is also to be noted that some of the ablest lawyers in the state were employed in the Empire Case and strenuously urged in the trial court, this court, and the Supreme Court that Tippett was entitled to what had been paid him. The fact that the Supreme Court granted a writ of error in the Empire Case manifested at least a serious doubt in the

mind of that court whether this court had properly construed the decision in Greene v. Robison.

The trial court's judgment is reversed, and judgment is here rendered for appellant.

Reversed and rendered.