EMPIRE GAS & FUEL COMPANY ET AL V. THE STATE OF TEXAS.

No. 5663. Decided February 24, 1932.
(47 S. W., 2d Series, 265.)

*James W. Finley,* of Bartlesville, Okla., *Phillips, Trammell, Chizum & Price,* of Fort Worth, for plaintiffs in error Empire Gas & Fuel Company.

The trial court's judgment in favor of the State of Texas and against the defendant, Empire Gas & Fuel Company, for one-half of the bonus and rentals, was erroneous, for the reason that, assuming the land to be within the terms of the Relinquishment Act, and to have been validly classified as mineral and grazing land, nevertheless the Relinquishment Act relinquishes to and vests in the landowner, in consideration of his services in leasing the land for oil and gas, and protecting it from offsets, and as compensation to him for damages to his soil, fifteen-sixteenths of the oil and gas, reserving to the State of Texas only one-sixteenth royalty; and such act plainly provides that the State of Texas shall receive only ten cents per acre of the bonus and rental. This being true, a judgment against this defendant was unauthorized, since it had paid all amounts due the State of Texas required to be paid by the Relinquishment Act. Greene v. Robison, 117 Texas, 516, 8 S. W. (2d) 655; Greene v. Robison, 109 Texas, 367, 210 S. W., 498; Smisson v. State, 71 Texas, 222, 9 S. W., 112; Hogue v. Baker, 92 Texas, 58, 45 S. W., 1004; Imperial Irrigation Co. v. Jayne, 104 Texas, 395, 138 S. W., 575, Ann. Cas., 1914-B, 322; Tex. Cent. Ry. Co. v. Bowman, 97 Texas, 417, 421, 79 S. W., 295; Conn. v. Terrell, 97 Texas, 578, 80 S. W., 608; Chancey v. State, 84 Texas, 529, 19 S. W., 706; Laws, 1919, 2 C. S., ch. 81, p. 249; Vernon's Ann. Civ. Stat., 1925, arts. 5367-5379; Constitution of Texas, art. 7, sec 2, and art. 7, sec. 4.

The court below erred in rendering any judgment against this defendant, for the reason that under any view of the Relinquishment Act, the landowner was constituted the agent

of the State to lease the land, and receive the bonus and rentals, with the possible exception of ten cents per acre, and the evidence shows in this case that the Empire Gas & Fuel Company contracted with J. H. Tippett, as agent of the State of Texas, as well as individually, and paid to him in such capacity all amounts due by it under the lease; and if the State of Texas was entitled to recover against anyone it was against its agent, J. H. Tippett, and not against this defendant; and the trial court's judgment to the contrary was therefore erroneous. Turner v. Cross & Eddy, 83 Texas, 218, 18 S. W., 578, 15 L. R. A., 262; Farmers & Mechanics' National Bank v. Hanks, 104 Texas, 320, 137 S. W., 1120; Galveston, H. & S. A. Ry. Co. v. Le Gierse, 51 Texas, 189; U. S. v. First National Bank of Detroit, 234 U. S., 245, 58 L. ed., 1298, 1304; Simmons v. Arnim, 110 Texas, 309, 220 S. W., 66; 25 R. C. L., sec. 218, p. 963.

If the State of Texas is entitled to recover against the defendant Empire Company, then certainly such company is entitled to recover over against the defendant Tippett, individually and as community administrator on its cross action, the parties to the contract being mutually mistaken as to the right and title of defendant Tippett, which mistake was a mistake of fact, under well settled rules of law, and sufficient to entitle defendant Empire Company to relief against the defendant Tippett, as awarded by the trial court.

(a) Even if it were a mistake of law, and not of fact (as the authorities hold), the mistake in this case was mutual upon the part of both the Empire Company and Tippett, and was such a basic, fundamental mistake as to authorize relief. Moreland v. Atchison, 19 Texas, 303; Hartsfield v. Wray, 181 Ky., 836, 205 S. W., 965; Silander v. Gronna, 15 N. D., 552, 108 N. W., 544; Ramey v. Allison, 64 Texas, 697; Ferguson v. Mounts, 281 S. W., 616.

*Harris, Harris & Sedberry,* of San Angelo, Texas, for plaintiff in error, J. H. Tippett.

In this suit the state, alleging that the lessee had paid the entire bonus and delay rentals to the lessor, Tippett, and seeking to recover one-half thereof, was suing upon an implied obligation, and under article 1995 (R. S., 1925), this suit was maintainable only in Tom Green county, which was the county of defendant Tippett's residence. Valdespino v. Dorrance & Co., 207 S. W., 649; Wool Growers Cent. Storage Co. v. Edwards, 10 S. W. (2d) 577.

Where it clearly appears from the oil and gas mining lease

that it was the intention of the lessor and the lessee that the bonus and delay rentals to be paid under the terms of the lease on mineral classified lands were to be paid to the owner of the soil, and in said lease further provided that out of the royalties and delay rentals in said lease provided to be paid to the lessor, the lessee should pay to the state one-sixteenth of the production and ten cents per acre per annum, the bonus belonged to the lessor, and all of the delay rentals belonged to the lessor except the ten cents per acre per annum required to be paid to the state under the Relinquishment Acts, and the state is not entitled to recover any part of the bonus nor delay rentals other than ten cents per acre per annum, and the judgment of the district court and Court of Civil Appeals awarding the recovery of one-half of the bonus and delay rentals to the state was and is erroneous and contrary to the law. Constitution of Texas, art. 7, sec. 5; Acts of 1917, ch. 83; Acts of 1913, ch. 173, p. 400; Texas Civ. Stat., 1911, ch. 1, title 93; Cox v. Robison, 105 Texas, 426, 150 S. W., 1149; Ehlinger v. Clark, 117 Texas, 547, 8 S. W. (2d) 666; Japhet v. McRae, 276 S. W., 669; Moorman v. Terrell, 109 Texas, 173, 202 S. W., 726; National Oil & Pipe Line Co. v. Teel, 95 Texas, 586, 68 S. W., 979; Page on Contracts, 2nd ed., sec. 675; Stephens County v. Mid-Kansas Oil & Gas Co., 113 Texas, 160, 254 S. W., 290; Stephens County v. Heffner, 118 Texas, 397, 16 S. W. (2d) 804; Texas Co. v. Daugherty, 107 Texas, 226, 176 S. W., 717; U. S. v. Trans-Missouri Frt. Assn., 166 U. S., 290, 41 L. ed., 1007; Waggoner Estate v. Wichita County, 273 U. S., 113, 71 L. ed., 566.

*Claude Pollard,* former Attorney General, *Robt. Lee Bobbitt,* former Attorney General, *C. W. Trueheart,* former Assistant Attorney General, *James V. Allred,* Attorney General, *J. A. Stanford* and *Geo. T. Wilson,* Assistants Attorney General, for defendant in error.

The plea of privilege of defendant, Tippett, was properly overruled because as concerns him this was a suit for the recovery of the consideration received by him under a written lease executed by him for plaintiff, which lease, by necessary implication of the law authorizing its making by Tippett, stipulated that all payment thereunder "shall be due and payable to the Commissioner at Austin," Travis County, Texas. City of Abilene v. Sayles, 295 S. W. (Com.), 578; Globe Indemnity Co. v. Barnes, 228 S. W. (Com.), 121; Trinity Portland Cement Co. v. Lion Bonding Co., 229 S. W., 487; Boyd v. Genitempo, 260 S. W., 934; Tex. Pac. Coal & Oil Co. v. Stuard, 7 S. W. (2d) 878; American Surety Co. v. Tarbutton, 248 S. W., 435.

A contract in writing to perform an obligation in Austin is equivalent under the venue statute to an obligation to perform it in Travis county. R. S., art. 1995, subd. 5; Stone v. Messer, 247 S. W., 911; Lind v. Bank, 16 S. W. (2d) 385.

Appellant, Tippett, being a necessary party defendant under the prayer for joint and several judgment against him and his co-defendant, Empire Company, in so far as the money sued for had been mispaid to him, the suit being lawfully maintainable as against the latter in Travis county under the fifth exception of the venue statute, such suit was also maintainable in Travis county as to the defendant, Tippett, under the provisions of exception 29a to the venue statute. R. S., art. 1995, subd. 29a; Lind v. Bank, 16 S. W. (2d) 385; Southern Surety Co. v. Solomon, 4 S. W. (2d) 599; Matagorda Canal Co. v. Markham Irrigation Co., 154 S. W., 1176; 47 C. J., 91, 87-88.

The Relinquishment Act is a continuing offer for sale by the State of the entire reserved oil and gas estate in sold public free school land through the agency of the owner of the soil, who is authorized by this act to secure the highest price obtainable for the school fund, like amounts (that is 50-50 on the whole price) being paid to this agent by the purchaser in lieu of damages to his surface through the mineral development of the land. It therefore cannot constitute a relinquishment to the owner of the soil of fifteen-sixteenths of or any interest in such mineral estate, nor can it effect a reservation to the State of only one-sixteenth of such estate or such fraction of the royalty, cash bonus or rentals; the intention of the parties to the contrary of the law notwithstanding. Furthermore, such construction of the Relinquishment Act as here contended for by appellants would render it unconstitutional as violative of sections 4 and 5 of article VII of the State Constitution. R. S., art. 5367 et seq; Acts 1919, 2d Called Session. chap. 81; Acts 1921, 1st Called Session, chap. 38; Greene v. Robison, 117 Texas, 516; Sheldon v. Robison, 117 Texas, 537; McDaniel v. Robison, 117 Texas, 539; Buvens v. Robison, 117 Texas, 541; McDaniel v. Robison, 117 Texas, 544; Bowen v. Robison, 117 Texas, 546; McDonald v. Dees, 15 S. W. (2d) 1075; Stallcup v. Robison, 117 Texas, 189.

*Underwood, Johnson, Dooley & Simpson* and *Sanders & Scott,* all of Amarillo, *Ben H. Powell* and *E. F. Smith,* of Austin, *C. L. McCartney,* of Brownwood, *T. L. Foster, J. W. Timmins* and *Martin A. Row,* all of Dallas, *Grisham, Patterson & Grisham,* of Eastland, *G. B. Smedley,* of Fort Worth, *E. E. Townes, R. E. Seagler, Rex G. Baker, L. C. Kemp* and *Vinson,*

*Elkins, Sweeton & Weems,* all of Houston, *T. J. Flannelly,* of Independence, Kan., *Homer Stimson,* of Royse City, *Charles Gibbs,* of San Angelo, *Geo. Cannon,* of San Antonio, *Thompson, Mitchell, Thompson & Young* and *R. H. Whilden,* all of Saint Louis, Mo., *F. O. McKinsey,* of Weatherford, and *Hiner & Pannell,* of Fort Worth, as amicus curiae.

On the question of the invalidity of Senate Bill No. 310, the last named counsel site: Greene v. Robison, 117 Texas, 516, 8 S. W. (2d) 655, and Wicks v. Comves, 110 Texas, 532.

Mr. Judge SHARP, of the Commission of Appeals, delivered the opinion for the court.

The Court of Civil Appeals in its opinion states the nature of the case as follows:

"The State of Texas recovered a joint and several judgment against J. H. Tippett, individually and as community survivor of the estate of his deceased wife, and Empire Gas & Fuel Company, a Maine Corporation, for one-half of the $16,800.00 cash bonus and one-half of the $1.00 per acre rental remaining after deducting the ten cents per acre paid the State, stipulated in an oil and gas lease executed by Tippett, in the capacity sued and as owner of the soil and agent for the State in virtue of the so-called Relinquishment Act (Articles 5367 and 5368; Acts 2nd C. S. 1919, p. 249) to the Empire Gas & Fuel Company on 480 acre of sold school land with mineral classification or reservation, out of Survey 4, Block 194, G. C. & S. F. Ry. Co. lands in Pecos County. By way of cross-action the Empire Gas & Fuel Company recovered judgment for a like amount over against Tippett in the capacity sued, it having paid Tippett the entire bonus and rental stipulated, save the ten cents per acre paid the State."

Both Tippett and the Empire Gas & Fuel Company appealed to the Court of Civil Appeals for the Third Supreme Judicial District and the judgment of the trial court was affirmed. 21 S. W. (2d) 376. Owing to the importance of the case, the Supreme Court granted a writ of error.

J. H. Tippett contends that the court erred in overruling his plea of privilege to be sued in Tom Green county. The record shows that the suit was instituted by the State against the Empire Gas & Fuel Company and J. H. Tippett for the recovery of $16,800, the amount of cash bonus, and one-half of the $1 per acre rental remaining after deducting the 10c per acre paid the State, as stipulated in the oil and gas lease executed by Tippett. The Empire Gas & Fuel Company is a Maine corpora-

tion, with an agent in Travis county. Article 5381, R. S., 1925, reads as follows:

"All payments shall be in the form of cash, bank draft on some State or National bank in Texas, postoffice or express money order, or such other form as the law may prescribe for making remittances to the State Treasury, and shall be due and payable to the Commissioner at Austin."

■■ It is a rule in this State that where contract is made, like the one under consideration, with reference to the performance of certain acts prescribed by statute, that the contract and statute will be considered together, and in view of the language of the statute that all sums of money owing the State "shall be due and payable to the Commissioner at Austin" is considered to be a contract in writing to perform an obligation in Travis county, Texas. Under subdivision 5 of article 1995, the Empire Gas & Fuel Company was properly sued in Travis county. Tippett was a proper and necessary party to the suit under the allegations and proof that he wrongfully received the bonus due the State under the terms of the Relinquishment Act and upon proper demand therefor had refused to pay same to the State. The Empire Gas & Fuel Company is a foreign corporation with an agent in Travis county, Texas, and it was properly sued in Travis county under subdivision 27 of article 1995, which in part says that a foreign corporation "may be sued in any county * * * where such company may have an agency or representative." Subdivision 29a of article 1995 also provides: "Whenever there are two or more defendants in any suit brought in any county in this state and such suit is lawfully maintainable therein under the provisions of article 1995 as to any of such defendants, then such suit may be maintained in such county against any and all necessary parties thereto." Therefore, it appears that Tippett was a necessary party and the suit being properly brought in Travis county against the Empire Gas & Fuel Company, suit could also be maintained against any and all necessary parties. This point has been expressly decided against the contentions made by Tippett. Pittsburg Water Heater Co. v. Sullivan, 115 Texas, 417.

It is further contended that the Court of Civil Appeals erred in its holding that one-half of the bonus to be paid and paid by the lessee Empire Gas & Fuel Company to Tippett, as lessor, in the oil and gas mining lease involved herein, belonged to the State of Texas and that the State was entitled to recover the same under the so-called Relinquishment Act dated July 31,

1919, and amendments thereto, now known as articles 5367 and 5368, R. S., 1925. They read as follows:

"Art. 5367. School and asylum lands.—The State hereby constitutes the owner of the soil its agent for the purposes herein named, and in consideration therefor, relinquishes and vests in the owner of the soil an undivided fifteen-sixteenths of all oil and gas which has been undeveloped and the value of the same that may be upon and within the surveyed and unsurveyed public free school land and asylum lands and portions of such surveys sold with a mineral classification or mineral reservation, subject to the terms of this law. The remaining undivided portion of said oil and gas and its value is hereby reserved for the use of and benefit of the public school fund and the several asylum funds."

"Art. 5368. Sale and lease by agent.—The owner of said land is hereby authorized to sell or lease to any person, firm or corporation the oil and gas that may be thereon or therein upon such terms and conditions as such owner may deem best, subject only to the provisions hereof, and he may have a second lien thereon to secure the payment of any sum due him. All leases and sales so made shall be assignable. No oil or gas rights shall be sold or leased hereunder for less than ten cents per acre per year plus royalty, and the lessee or purchaser shall in every case pay the State ten cents per acre per year of sales and rentals; and in case of production shall pay the State an undivided one-sixteenth of the value of the oil and gas reserved herein, and like amounts to the owner of the soil."

Plaintiffs in error further contend that the Relinquishment Act provided that out of the royalties and delay rentals in the lease to be paid to the lessor, the lessee should pay to the state 1/16 of the production and 10c per acre per annum, the bonus belonged to the lessor, and that the State is not entitled to recover any part of the bonus nor delay rentals other than ten cents per acre per annum and that the judgment awarding the State the recovery of the one-half bonus and delay rentals was erroneous and contrary to the law.

The lease involved herein was executed June 21, 1927, by J. H. Tippett for himself and as survivor in community of the estate of Laura Tippett, deceased, as lessor, and as agent of the State of Texas, to the Empire Gas & Fuel Company, as lessee, and recited a consideration of $16,800 cash, paid by lessee to lessor, and for the payment of royalties, to-wit: ⅛ of the oil and gas produced and saved by lessee, and stipulated for a forfeiture if no well be commenced or delay rentals paid at the

rate of $1 per acre per annum, payable annually, during the primary term of the lease, and further stipulated that out of the royalties and rentals to be paid the lessor, that the lessee shall pay 1/16 of the production to the State, as well as 10c per acre per annum.

It was agreed that no operations had been commenced for the development of oil and gas at the time of the trial. It is undisputed that Tippett at the time he made the lease received the $16,800 in cash as a bonus for himself and has received certain rentals thereon since the execution of the lease. The State recovered judgment against the Empire Gas & Fuel Company and J. H. Tippett, jointly and severally, for $8,400, one-half of the cash consideration, and $192, the remainder of one-half of the annual delay rentals for one year, 10c an acre having been paid to the state direct by the lessee for such year.

Very able and exhaustive briefs have been filed by attorneys for litigants involved and others as amici curiae, earnestly contending that the Relinquishment Act and the amendments thereto authorized the state to receive only 1/16 of the oil and gas as a royalty therefrom and the sum of 10c per acre per annum as rental therefor and that this was all the Legislature intended for the state to receive and that under no proper construction of this act is the State entitled to one-half of any bonus or rental in excess of 10c per acre. This precise question was decided adversely to the contentions of plaintiffs in error by our Supreme Court in a well-considered and exhaustive opinion construing the Relinquishment Act. Greene v. Robison, 117 Texas, 533. But it is vigorously contended that the Supreme Court in that case was unwarranted in construing the act to mean that the state was entitled to recover any part of the bonus nor delay rentals other than the 1/16 royalty and 10c per acre per annum.

Let us pause here long enough to review briefly some of the important matters presented to the Supreme Court in that case for decision. It will be helpful to keep in mind that the Constitution set aside large bodies of our public domain for educational purposes. Lands were appropriated and dedicated to the public free schools, to counties, to asylums and to the State University and its branches. See article 7 and the various subdivisions therein. Our Constitution, among other provisions, contains the following:

Section 51, article 3, in part reads as follows:

"The Legislature shall have no power to make any grant or authorize the making of any grant of public money to any

individual, association of individuals, municipal or other corporations whatsoever."

Section 53, article 3, in part reads as follows:

"The Legislature shall have no power to grant, or to authorize any county or municipal authority to grant, any extra compensation, fee or allowance to a public officer, agent, servant or contractor, after service has been rendered, or a contract has been entered into, and performed in whole or in part. * * *"

Section 55, article 3, reads as follows:

"The Legislature shall have no power to release or extinguish or to authorize the releasing or extinguishing, in whole or in part, the indebtedness, liability or obligation of any incorporation or individual, to this State, or to any county or other municipal corporation therein."

Section 4, article 7, in part reads as follows:

"The lands herein set apart to the Public Free School Fund, shall be sold under such regulations, at such times, and on such terms as may be prescribed by law; and the Legislature shall not have power to grant any relief to purchasers thereof. * * *"

Section 5, article 7, in part reads as follows:

"The principal of all bonds and other funds, and the principal arising from the sale of the lands hereinbefore set apart to said school fund, shall be the permanent school fund, and all the interest derivable therefrom and the taxes herein authorized and levied shall be the available school fund * * *. And no law shall ever be enacted appropriating any part of the permanent or available school fund to any other purpose whatever."

See also section 15, article 7.

■ It is settled in this state that the reserved mineral interest in the land constitutes a part of the permanent free school fund. Section 2 of article 7 of the Constitution defines the school fund as follows: "All funds, lands and other property heretofore set apart and appropriated for the support of public schools; all the alternate sections of land reserved by the State out of grants heretofore made or that may hereafter be made to railroads or other corporations of any nature whatsoever; one-half of the public domain of the State; and all sums of money that may come to the State from the sale of any portion of the same shall constitute a perpetual public school fund."

By the terms of the act, approved February 23, 1900 (chapter 11, Gen. Laws, 1st Called Session 26th Leg.), all of the un-

appropriated public domain of the State of Texas was set apart for the public free school fund.

It has long been the policy of the law of this state that a grant or reservation of minerals includes the mineral easement, the necessary right to use the surface of the earth in the enjoyment of the mineral estate. In the early case of Cowan v. Hardeman, 26 Texas, 217, the Supreme Court upheld this doctrine and interpreting a legislative enactment reserving the minerals in sales of public lands, held:

"The object and purpose of the Legislature was simply to reserve to the republic the islands and the salt springs, gold and silver mines, copper and lead and other minerals, as corporeal hereditaments out of the public domain; and thus, while the mineral resources of the country that were then known to exist or that might afterwards be developed were thereby secured to the government, no embarrassment was placed in the way of the citizen in acquiring the fee in the quantum of land to which his certificate or scrip entitled him. *It is a well established doctrine from the earliest days of the common law, that the right to the minerals thus reserved carries with it the right to enter, dig and carry them away, and all other such incidents thereto as are necessary to be used for getting and enjoying them. The Queen and Earl of Northumberland, 1 Plow. 310, 336; Earl of Cardigan v. Armitage, 2 Barn. & Cross, 197. And this is also the civil law. Rockwell's Spanish and Mexican Law, 49, 53, 83.*" (Italics ours).

In the course of the opinion it was further held:

"In so far as concerns the use, it may, however, be avoided in part or in whole by the State in the exercise of its reserved right in the sale spring or minerals embraced within it. *The State must have the easement of going upon the land for this purpose; and if to the full enjoyment of the right of the State, it should become necessary to use the whole of the land, timber and water upon the tract, the right of the State to an easement to that extent cannot, I apprehend, be questioned.*" (Italics ours).

It is also well settled by the decisions of the Supreme Court that oil is a part of the land and can be sold in place. State v. Hatcher, 115 Texas, 332, 281 S. W., 192.

■ Prior to the enactment by the Legislature of the Relinquishment Act the school fund of this State owned not only the oil and gas in place, but also the right or estate to go on the land and use it in the conduct of mining operations. That right or

estate was owned by the school fund, and not by the purchaser of the surface estate.

The litigants, as well as other parties interested in the case of Greene v. Robison, supra, were represented by able attorneys. Perhaps in no case ever presented to the Supreme Court in this State was there a stronger array of counsel than appeared in that case. All were distinguished lawyers; some had filled with great distinction official and judicial positions in this State; and in view of their records and character, we think it can be safely said that their reputations are beyond the reach of censure and are worthy of the highest praise for ability, integrity, and patriotism. In addition to making oral arguments to the court, they also filed written arguments.

We will take the liberty of presenting briefly short extracts from some of the arguments filed in that case for the purpose of showing the nature of the argument and the divergent views presented to the court.

Hon. Charles L. Black, one of the ablest of lawyers, represented Greene, the relator, and in a very able and trenchant argument, contended that the Relinquishment Act of 1919 was unconstitutional and void, and, among many other things, said:

"The Relinquishment Act is not equivalent to a statute wherein the Legislature definitely fixes the price of the mineral estate and authorizes its sale *at that price*. The Relinquishment Act is equivalent to a statute—and is in fact a statute—authorizing the employment of an agent to sell the mineral estate and providing for his compensation as agent by giving him all of the consideration received when a sale occurs, over and above a definitely fixed amount.

"* * *

"The Relinquishment Act is exactly equivalent to a statute authorizing the employment of an agent to sell school lands upon a consideration fixed by him, with liability on his part to account for a definitely fixed part of that consideration. Under such a statute, the lands could be sold only when the agent had fixed the consideration. A purchaser buying the land would pay not only the consideration fixed by the Legislature, but also pay that fixed by the agent.

"* * *

"Under the terms of the Relinquishment Act, the land owner either becomes an owner of a present interest in the land, perforce the statute, or he becomes an agent with the power to sell the land, coupled with an interest in the land, or at least an interest in the proceeds of the sale of the land. It is urged

that an agency must be accepted. We agree. An agency can-not be forced on one by law. But this Court has held that the Legislature has no power to employ agents by *contract* and pay them out of the school fund. Can they be employed by *law* and paid out of the school fund? A contract is created in either case.

"We shall not quarrel over mere treminology. Legal validity is to be tested by actual fact, and not by name or form. Call the surface owner an agent or call him an owner; the obvious fact to be explained is this: In some way, either as owner, perforce the statute, or as agent, perforce the statute and his acceptance, he acquires the right to a part of the consideration for the sale of the land.

"If the mere act of selling the land is an acceptance of the statute, then what is that act? It is either an act of agency or of ownership, or both. Under either view, what does he pay the State for that which he accepts and receives? The answer can only be *services,* and the Constitution forbids the investment of the public free school fund in services."

Hon. G. B. Smedley, a former distinguished assistant attorney general, contended for his clients that the Relinquishment Act was constitutional, and among other things said:

"To one who has not struggled considerably with the intricacies of our school land laws it is to say the least confusing that under the sales law, as construed by our courts, the purchaser of school land classified as mineral gets no interest in any of the minerals in the land, but at the same time through operation of the Relinquishment Act gets in the purchase of the same land fifteen-sixteenths of the oil and gas. This peculiar situation is explained in part by the fact that for many years our school land laws have been a patch work, each law being cumulative of the other, and no new law repealing a prior law unless clearly inconsistent with the prior law. The situation is explained also by the fact that the sales law, as construed, is general in its nature and relates to all minerals of every character in the land, whereas the Relinquishment Act is special in its nature and relates only to oil and gas. This peculiar situation is better understood in the light of the practice of the Commissioner of the Land Office at the time of the passage of the Relinquishment Act, which was to classify all public school land as mineral, without reference to evidence or information as to mineral bearing qualities or possibility. * * * The result was that no purchaser of school land acquired the oil and gas in the land purchased, it being reserved to the State, and the land after the

purchase was open to applications for oil and gas permits under the Minerals Acts of 1913 and 1917. This resulted in an ownership of the surface in one person and an ownership of the oil and gas in another person, with all of the strife and other evils attending such dual ownership.

"It was this condition that the Legislature attempted to cure by the passage of the Relinquishment Act. The purpose and effect of the Act was to declare that the making of a mineral classification by the Commissioner should not have the effect of reserving all of the oil and gas to the State, but that it should be effective to reserve but one-sixteenth of the oil and gas and all other minerals to the State and that by virtue of this new act fifteen-sixteenths of the oil and gas should pass to the purchaser of the land, notwithstanding the making of the mineral classification by the Commissioner. This sort of legislation afforded an awkward means of securing the desired result. It was awkward because it was a compromise measure worked out to satisfy as far as possible the different interests, and because an effort was made to accomplish the result without changing too materially the existing law."

Hon. R. L. Batts, who has held with distinction many positions of honor, was a member of the United States Circuit Court of Appeals at New Orleans, represented Hon. J. T. Robison, Land Commissioner of Texas, and respondent in that suit, and while contending that the act was constitutional, recognizing the obscurity of the act, said:

"The Act of July 31, 1919, Chapter 81, The 'Relinquishment Act,' is constitutional exercise of the duties of the Legislature with reference to the public school lands, and a wise and proper exercise thereof.

"The act under consideration may not in all respects be consistent with itself, and it may be that there are provisions that will not stand judicial scrutiny. An Act however carefully prepared, after going through the process of legislative amendment, is usually subject to criticism as to phraseology and form. This, as every act, should be considered with reference to its purpose and the method of accomplishing the purpose."

Hon. F. A. Williams, one of our greatest lawyers and judges, who for years was associate justice of the Supreme Court of Texas, filed an argument and while contending that the act was valid and should be upheld, frankly admitted with respect to the act that "on some points the Act is obscure."

Hon. Dan Moody, who was then attorney general and afterwards governor of this State, filed a brief, contending that the

Relinquishment Act was clearly in violation of the provisions of the Constitution and void, and, among other things, said:

"It is clearly manifest that the Relinquishment Act as a whole violates section 4, article 7 of our State Constitution, which provides that the lands set apart to the public free school fund shall be sold under such regulations, at such times and upon such terms as may be prescribed by law and that the proceeds of such sales shall be invested in bonds of the United States, the State of Texas, or counties in said State, or in such other securities and under such restrictions as may be prescribed by law. It is also violative of that part of section 5, article 7, of the State Constitution which provides that the lands and all bonds and other funds and the principal arising from the sale of such lands shall constitute a permanent school fund *and that no law shall ever be enacted appropriating any part of the permanent or available school fund to any other purpose whatever.*

"Under the act the owner of the soil acquires fifteen-sixteenths of the oil and gas in the land without paying therefor a consideration in money. The practical effect of such is a division of a part of the corpus of the property between the State and the owner of the soil in consideration of the development and production of oil and gas by the latter. This character of disposition of said lands is an appropriation of a part of the school fund to a foreign purpose and violates that provision of the Constitution commanding that no law shall ever be enacted appropriating any part of the permanent or available school fund for any other purpose whatever. To uphold the act would place a part of the permanent school fund where it could not be invested in bonds as is required under the Constitution. Besides, it is clear that the relinquishment of fifteen-sixteenths of the oil and gas to the owner of the soil is purely a donation, and for that reason the act does not meet the constitutional provision requiring such lands to be sold.

"Further, the act designating the owner of the soil as agent of the State in selling the oil and gas in these lands through the execution of leases violates the Constitution for the reason it fails to prescribe regulations under which the sales are to be made and wholly fails to fix any time for the termination of said leases and does not prescribe the terms under which the sales of the oil and gas are to be made through such leases."

Honorable Claude Pollard, who succeeded Hon. Dan Moody as Attorney General of Texas, filed a brief strongly contending

that the Relinquishment Act was unconstitutional, and, among other things, said:

"* * * No more important question perhaps has ever been before this Court than the question of the constitutionality of this Relinquishment Act. We believe though that when carefully analyzed it is by no means difficult of solution—a solution that condemns the Act as flagrantly unconstitutional.

"* * *

"Having sworn to support a Constitution that throws definite limitations upon the power of the Legislature, we have no apologies to make for denouncing a law that infringes upon these basic limitations."

He further says:

"From the foregoing review of the Relinquishment Act, it plainly appears that the operation of all of its provisions turns upon the validity of the relinquishment made in Section 1 (Article 5367) of the Act, or else in the alternative upon the delegation of power in Section 2 (Article 5368). Some of the others though throw light upon the three questions presented, viz: Whether the Act makes a donation of an interest in the mineral estate to the owner of the soil; whether, if not, a consideration provided for in the sale of such interest to him is services rendered by him in making lease; and whether, lastly, if it does not create a present grant of such interest to him but merely creates a power of sale, it delegates to him the legislative function of prescribing the times, terms and regulations of sale.

"The constitutionality of the Relinquishment Act as affecting lands theretofore sold (that is, prior to the effective date of said Act) and as affecting lands thereafter sold, is in a somewhat different situation. In its prospective aspect, the Relinquishment Act as codified in 1925 (Article 5367-79) if possible must be construed along with and reconciled with Article 5310, which provides for a reservation of minerals in connection with the sale of lands. If it can thus be construed as making provision for the sale, instead of the relinquishment, of 15/16 of the oil and gas in lands thereafter sold, it may be that the Act in its prospective aspect could be so far upheld; but there would still remain the questions as to whether the sale was not for a consideration other than money, and whether it was a delegation of a legislative function, as rendering it invalid in any event."

Honorable Nelson Phillips, formerly a distinguished Chief Justice of the Supreme Court, filed a brief in that case and

while contending that the act was constitutional with respect as to whom was to receive the bonus in case of a sale of the minerals, said:

"But I direct attention to the fact that neither in Section 2 nor elsewhere in the Act is there any provision that any such 'bonus' should there be a sale or lease for a 'bonus,' should go to and become the property of the land owner. The Act is wholly silent on the subject. It distinctly does not provide that any such 'bonus' should be paid to and belong to the land owner. With this true, the Act cannot fairly be construed as awarding or give any such 'bonus' to the land owner. On the contrary, it is to be construed (if any construction at all as to a 'bonus' is to be indulged) as directing that any such 'bonus' should belong to and be paid to the State under the established rule that if it is possible to construe an act as in accord with the Constitution, that construction will be adopted rather than one which invalidates the act even in part."

Many others could be cited but to do so would prolong this opinion beyond its proper length.

Thus, it was ably and forcibly contended by many that the Relinquishment Act was clearly violative of the plain provisions of the Constitution and that it was the duty of the Supreme Court to declare it void in order to protect the school funds from misappropriation as intended by the framers of the Constitution. On the other hand, it was vigorously contended that the act was passed for the benefit of the purchaser of the land from the State; that the State, while relinquishing unto the purchaser 15/16 of the minerals, constituted him as its agent and allowed him certain compensation for performing certain services; that unless it clearly appeared that the act was unconstitutional, the court should uphold same. It was also very vigorously contended that the amount given the purchaser by the State for the services to be performed as described in the act was a pure gift and that the recital of what services were to be performed by him as the agent of the State, was nothing but a subterfuge for the purpose of evading the plain provisions of the Constitution.

■ The Supreme Court had before it the difficult question for decision: Was the Relinquishment Act legal or illegal? Had the Legislature exceeded its authority or could it be sustained consistent with the general principles of law?

In the construction of statutes the correct rule is clearly stated in 36 Cyc., sec. 2, pp. 1106, 1107, and 1108, as follows:

"The great fundamental rule in construing statutes is to

ascertain and give effect to the intention of the legislature. This intention, however, must be the intention as expressed in the statute, and where the meaning of the language used is plain, it must be given effect by the courts, or they would be assuming legislative authority. But where the language of the statute is of doubtful meaning, or where an adherence to the strict letter would lead to injustice, to absurdity, or to contradictory provisions, the duty devolves upon the court of ascertaining the true meaning. If the intentions of the Legislature cannot be discovered, it is the duty of the court to give the statute a reasonable construction, consistent with the general principles of law."

In R. C. L., 25, sec. 243, pp. 1000 and 1001, a familiar rule is stated as follows:

"Where an act is fairly susceptible of two constructions, one of which will uphold the validity of the act while the other will render it unconstitutional, the one which will sustain the constitutionality of the law must be adopted." See Maud v. Terrell, 109 Texas, 97; Staples v. State, 112 Texas, 61, 245 S. W., 639.

Associate Justice Pierson, in rendering the opinion for the Supreme Court, and in passing upon this very question, says:

"It is vigorously contended by able counsel for relator, and attorneys as *amici curiae,* that the Act authorizes the agent, the owner of the soil, to fix the terms under which the oil and gas shall be sold; that in addition to the ten cents per acre per year for the State, plus a one-sixteenth royalty and ten cents per acre per year for the owner of the soil, plus a one-sixteenth of production, the owner of the soil, as agent of the State, is authorized to sell the oil and gas in the land for such additional amounts as he may be able to get; that he may demand 'one-sixteenth or two sixteenths' or any per cent. above the minimum provided in the Act, and an additional or large bonus, and that this authority in him is in contravention of Section 4, Article 7, of the Constitution.

"As pointed out, the Act provides that the owner of the land, as agent of the State, is authorized to sell or lease the oil and gas 'upon such terms and conditions as such owner may deem best, subject only to the provisions hereof'; and that 'no oil or gas rights shall be sold or leased hereunder for less than ten cents per acre per year, plus royalty, and the lessee or purchaser shall in every case pay the State ten cents per acre per year of sales and rentals,' and one-sixteenth of the value of the

oil and gas in case of production, and 'like amounts to the owner of the soil.' (Art. 5368).

"Section 2 of the original Act of 1919, which became Article 5368, R. S. 1925, contained a provision that all sales or leases 'shall, as respects the rental to be paid, be made for and inure to the benefit of the State to the extent herein provided.'

"We interpret the Act to fix a minimum price of ten cents per acre per annum and the value of one-sixteenth of the gross production free of cost to the state, for which the State is willing to sell the oil and gas, and the agent is authorized to secure the highest price obtainable for the benefit of the fund to which the land belongs—like amounts received by the State to be paid by the purchaser to the owner of the soil. If a bonus is paid, if a larger royalty or other amounts are contracted for, the State and the owner of the soil receive equally in like amounts." Greene v. Robison, 117 Texas, 516, 8 S. W. (2d) 655.

The court in the foregoing case further held that articles 5370 and 5371, R. S., 1925, were clearly void, and said:

"In Article 5370, after providing for a forfeiture for failure to drill offset wells, it is provided: 'The oil and gas relinquished herein shall revert to and become the property of the State's general revenue fund.'

"In Article 5371, after providing that the oil and gas so forfeited shall be sold to the highest bidder, etc., it is provided: 'The sum received in addition to the reserved one-eighth shall be divided equally between the General Revenue Fund and the owner of the soil.'

"The oil and gas belongs to the State for the benefit of these various funds, and their proceeds must go where the Constitution provides."

In the case of State v. Hatcher, supra, it was held that under the Constitution, art. 7, secs. 10-12, 15, payment by lessees of oil and gas leases under Acts 1917, chap. 83, sec. 17, as amended by Acts 1917 (3rd Called Session), chap. 21, sec. 1 (Vernon's Ann. Civ. St. Supp., 1918, art. 5904q), on University lands, goes to permanent fund of University, regardless of Acts 1925, chap. 71, sec 7; and Acts 1925, chap. 175; placing proceeds of oil and gas leases on University lands in available building fund of University violates Constitution, art. 7, sec. 15, and is null and void.

■ The rule is also well settled that legislative grants of property, rights, or privileges, must be construed strictly in favor of the state on grounds of public policy, and whatever is not unequivocally granted in clear and explicit terms is with-

held. Any ambiguity or obscurity in the terms of the statute must operate in favor of the state. 36 Cyc., p. 1177; Lewis' Sutherland Statutory Construction, vol. 2, sec. 548; Central Transportation Co. v. Pullman Palace Car Co., 139 U. S., 24, 11 Sup. Ct. Rep., 478, 35 L. Ed., 55, 18 R. C. L., p. 1220. This act has been carefully considered in the light of the foregoing rule and there is found no language expressing the intention of the Legislature to give the land owner all of the bonus. Under this rule if the act is silent as to whom the bonus belongs then it necessarily would become the property of the state. However, under the fair and reasonable construction given to the expression "like amounts to the owner of the soil" by the court in Greene v. Robison, we are constrained to hold that the owner of the soil may receive one-half of the bonus, and the remaining half is to .be received by the state. Certainly, there is no express intention or provision in the act that all of the bonus should be paid to the land owner, and it cannot be construed as giving all of the bonus to the land owner. To hold that the land owner is to receive all of the bonus would be to read into the law words not placed there by the Legislature. Therefore, following the well established rule that if it is possible to construe a law which is fairly susceptible of two constructions, one which will uphold the validity of the law, while the other will invalidate it, the duty devolved upon the court of ascertaining the true meaning of the Legislature as expressed in the law. The law not being plain in its terms as to whom the bonus was to be paid, the Supreme Court gave the statute a reasonable construction, consistent with the general principles of law, and held that the bonus was to be paid equally to the state and to the land owner. Certainly the land owner can not complain of such construction.

Since this case has reached the Supreme Court, the 42nd Legislature has enacted Senate Bill No. 310, approved March 13, 1931, which has for its purpose the modification of the right of the state and the purchaser of oil and gas under the provisions of the Relinquishment Act, as construed by our Supreme Court in the case of Greene v. Robison, supra. In reaching a decision in the instant case it becomes necessary to determine the validity of the Act of 1931. We set out the material parts, which read as follows:

"Section 1. That Article 5367 of the Revised Civil Statutes of Texas, of 1925, Chapter 4, Title 86, is hereby validated, and the title to 15/16 of all minerals in all lands included within the terms of Sections 1 and 2 of Chapter 81, General Laws of the

Second Called Session of the 36th Legislature, as amended by Section 1, Chapter 38, General Laws of the 1st Called Session of the 37th Legislature, is hereby vested, confirmed and validated in the owner of the soil, his heirs, successors and assigns, and the outstanding sales contracts and patents affecting said lands are hereby enlarged to include 15/16 of the minerals to the owner of the soil, his heirs and assigns, and to reserve to the State 1/16 of the minerals as a free royalty in case of production, and the owner is authorized to develop said minerals, or make such leases or sales of same, as he may deem proper, subject only to the reservation of the State's 1/16 free royalty interest.

"This enlargement of the original sale is made in consideration of the co-operation of the owner of the soil in promoting the discovery, development and production of said minerals, and as a measure of damage to the soil and improvements thereon, and the further consideration of the payment of one cent per acre, and shall not become effective as to any tract or tracts unless and until the owner of said tract or tracts, his heirs, successors, assigns, or personal representatives shall make application to the Commissioner of the General Land Office to enlarge his original purchase to include 15/16 of the oil and gas and all other minerals on, in or under said land and pay the sum of one cent per acre for each acre contained in said tract or tracts, which sum shall be credited to the proper fund. Upon receipt of such application and payment, the Commissioner of the General Land Office is authorized and required to issue an award to show the acceptance of this provision by the owner. Such an award shall clearly set forth that the owner of the soil, his heirs and assigns, is the owner of the legal and equitable title to 15/16 of the minerals subject to the balance, if any, due the State of Texas on the original purchase price, and that the State's reserved interest consists of a royalty interest of 1/16 of all minerals that may be produced and saved on said land, free and clear of any expenses or charges for development. Upon the issuance of patent, same shall include 15/16 of the minerals and shall expressly provide that 1/16 royalty only is reserved to the State. The enlargement of the original sale to include 15/16 of the minerals by the owner of an interest in said land shall inure to the benefit of all of the owners thereof.

"Sec. 2. The owner of land sold by the State with mineral reservation, or mineral classification, and of mineral rights acquired under the terms of this Act, is hereby authorized on his own behalf and as agent for the State as to the royalty

reserved by the State to develop said minerals, or to sell or lease said land for oil and gas and other mineral development and production, to contract for such development, or to develop and produce said minerals on such terms as such owner may deem proper, and without further action by or on behalf of the State, subject only to the conditions that the lessee and producer of said minerals shall deliver to the State 1/16 part of said oil or gas or other minerals so produced and saved, free of cost in the pipe line to which said oil or gas wells are connected, and at the mouth of the mine in the event any other mineral is produced. Such leases may be made by the owner, his heirs, successors, or assigns, or by any personal representative of said owner or his heirs appointed by any Court of Competent Jurisdiction. All leases so made shall be assignable in whole or in part. No development, contract, lease or assignment executed hereunder shall be binding on the State until said instrument, or a copy thereof, is filed in the General Land Office. Whenever the commencement of development for the discovery and production of oil, gas or other minerals shall begin written notice thereof shall be immediately filed with the Commissioner of the General Land Office, both by the owner of the land and by the lessee; similar notices shall be given when production begins or is obtained. All royalties and other payments to the State under this Law shall be paid to the State through the Commissioner of the General Land Office in Austin, Texas.

"Section 3. All sales and leases of oil and gas that have heretofore been in good faith made by the owner of the soil as heretofore authorized, and in which 1/16 of the oil and gas has been reserved as a royalty to the State of Texas, and the sum of ten cents per acre paid to the State at the inception of such lease, and on which the lessee has paid to the State the sum of ten cents per acre each year since the date of such lease or until production was had thereon, or upon which such payment shall be made within six months after this Act takes effect, are hereby validated, and no claim shall be made by the State for the payment of any bonus or rental thereon in excess of the said sum of ten cents per acre per annum, and all sales or reservations of royalty or interest in the oil and gas arising through contracts heretofore entered into between owners of the soil in reference to their 15/16 interest in the oil and gas, as hereby ratified and confirmed. In all cases wherein any claim for rental, or other payments due the State of Texas under any lease heretofore executed by the owner of the soil, affecting lands covered by this Act, shall not have been paid, and shall

not be paid within six months after the passage of this Act, such lease shall forfeit for non-payment of such consideration or rental, and such forfeiture shall be in lieu of any claim for such consideration or rentals.

"Sec. 4. The validation of leases and royalty sales heretofore made shall not be construed to validate any lease or royalty sale, the validity of which is involved in litigation at the time of the passage of this Act.

"Sec. 5. If any part of this Act should ever be held to be unconstitutional, such holding shall not affect the remaining provisions thereof.

"Sec. 6. In all cases where the owner of the soil shall have acquired the legal title to 15/16 of the minerals, as provided in this Act, Articles 5369, 5370, 5371, 5372, 5373, 5374, 5375, 5376, 5377, 5378 and 5379 shall hereafter not apply.

"Sec. 7. All laws, or parts of laws, in conflict herewith are hereby repealed."

The question presented for decision is: Is Senate Bill No. 310 constitutional? The sovereign power of our government rests with the people. The Constitution is the organic law of the land. It represents the expression of the will of the people and in the light of the history of governments, its adoption is for the purpose of preserving certain rights and prescribing certain powers under which the Legislature, the executive and the judiciary perform their functions. The provisions of the Constitution are supreme and the executive, the Legislature and judiciary are without power to change or to trench upon these provisions. It is not the province of any department of the government to question the wisdom of any provision in the Constitution and any act which runs contrary to the Constitution is void. Certain rights belonging to the people have been definitely and wisely embraced within the provisions of our Constitution. One of the paramount purposes contained in that instrument was to lay the foundation for the encouragement, endowment and perpetuation of a permanent school fund. Such a fund was established. It plainly and definitely provided that such a fund should not be donated or impaired unless in accordance with the provisions of the Constitution.

With these provisions of the Constitution above quoted in mind, let us analyze the provisions of the foregoing Senate Bill No. 310 with a view of ascertaining if all or any part of the act conflicts with the provisions of the Constitution. This bill has for its purpose the modification of the rights belonging to the state by reason of the provisions of the Relinquishment Act.

The Relinquishment Act was passed in 1919. By the provisions of this act, the State constitutes the owner of the soil its agent to sell or lease to any person, firm or corporation the oil and gas that may be thereon or therein, upon such terms and conditions as such owner may deem best, subject to the conditions that 1/16 of the gas and oil in case of production as royalty and 10c per acre per year as rental and like amounts to the owner of the soil shall be paid the State by the lessee.

As construed by the Supreme Court, this law authorizes the oil and gas to be sold, retaining to the State as a minimum 1/16 of all gas and minerals as royalty and ten cents per acre per annum and one-half of all amounts received by the owner over and above the foregoing amounts. The law fixed the rights of the State, as well as the rights of the purchaser. Since the inception of this act, all purchasers of lands from the State under the provisions thereof, agreed to pay the State over and above 1/16 royalty and ten cents per acre, one-half of all other sums received for the gas and oil. Besides, the provisions of the act made the purchaser of land the agent of the State to secure a purchaser and fixed his compensation definitely therefor. What does the Legislature understake to do under certain provisions of Senate Bill 310? It expressly undertakes to relieve the purchaser from the payment of any sum over and above the 1/16 royalty and the 10c per acre. This is a plain violation of section 51, article 3, of the Constitution, quoted above. The Relinquishment Act constituted the buyer the agent of the State in making mineral leases and fixed his compensation and under the provisions of that act he was to receive for his services one-half of all sums over and above the royalty and ten cents per acre rental. The provisions of Senate Bill 310 undertake to take from the State all of the bonus and give it to the agent whose rights were fixed in the Relinquishment Act enacted in 1919. This is in clear violation of section 53, article 3, of the Constitution, above quoted.

Again, the Legislature in Senate Bill 310 undertakes to grant relief to purchasers of oil and gas sold by the State under the provisions of the Relinquishment Act and this is plainly contrary to the provisions of section 4, article 7, of the Constitution of this State.

As shown by this record, the services of Tippett as an agent for the State had been rendered, his compensation fixed, and the Empire Gas & Fuel Company and Tippett owe the state one-half of all sums received above the royalty and 10c per acre rental. These rights and obligations of the parties were

definitely fixed by law. For the Legislature to undertake to change the conditions fixed by law by releasing or extinguishing the debt owing by Tippett and the Empire Gas & Fuel Company to the State, by relieving them or either of them of their obligations, or any part thereof, to the State, or granting them or either of them any relief as purchasers of the mineral rights, in so far as Senate Bill 310 undertakes to do this, it is clearly repugnant to the provisions of the Constitution and is, therefore, void.

The case of Delta County v. Blackburn, 100 Texas, 51, involved the right of Delta county, to which certain public lands of certain obligations by reducing the rate of interest which Blackburn in his contract with the county had agreed to pay for the lands so purchased, and the Supreme Court, in an opinion by Judge Williams, squarely held that the order reducing the rate of interest was beyond the power of the court to make, being a partial release of an obligation to the county because violative of section 55, article 3, of the Constitution.

In the case of Love v. City of Dallas, 120 Texas, 351, 40 S. W. (2d) 20, the Supreme Court in discussing the provisions of the Constitution and various statutes with reference to school funds allocated by the State, held that when once appropriated or dedicated for educational purposes, that they became within the protective clauses of both the State and Federal Constitutions. In an able and exhaustive opinion Chief Justice Cureton, in the course of the opinion, held:

"In view of the history of the subject and the statutory and constitutional provisions referred to above, it is plain, we think, that the property and funds of the public schools are held in trust by the city, district, county, or other statutory agency, to be used for the benefit of the school children of the community or district in which the properties exist, or to which the school funds have been allocated. We think these properties and funds are so plainly and clearly impressed with a trust in favor of the local public schools of the city or district that they are within the protective clauses of both the State and Federal Constitution, and that the Legislature is without power to devote them to any other purpose or to the use of any other beneficiary or beneficiaries. 24 Ruling Case Law, p. 593, sec. 47; Smisson v. State, 71 Texas, 222, 231, 9 S. W., 112; Milam County v. Bateman, 54 Texas, 153; Parks v. West, 102 Texas, 11, 111 S. W., 726; Sun Mutual Ins. Co. v. Board of Liquidation, 31 La. Ann., p. 175."

See many other authorities cited therein.

The rule is also well recognized in the construction of statutes that if it can be lawfully done, it is the duty of the court to construe the statute so as to render it valid. It is also clear, generally speaking, that where a statute contains provisions which are legal and others which are not, effect may be given to the legal provisions by separating them from the illegal. But this applies only to a case where the provisions are separable and not dependent one upon the other and does not support the contention that which is indivisible may be divided. 9 Texas Jur., pp. 472 and 473; State v. Laredo Ice Co., 96 Texas, 461; Howard v. Illinois C. R. Co., 207 U. S., 463.

We have carefully considered Senate Bill 310 with the view, if possible, of separating the legal from the illegal parts. We conclude that its parts are so intermingled that if any of the parts were constitutional, they cannot be severed from the parts that are unconstitutional. In the form of this bill as enacted, we see no possibility of separating them,—so that each remains as complete in itself and capable of being executed in accordance with the legislative intent, wholly independent of that part which is rejected as being unconstitutional.

We therefore hold that the entire act is void.

The judgments of the trial court and the Court of Civil Appeals will be affirmed.

The foregoing opinion is adopted as the opinion of the Supreme Court, and judgment will be entered in accordance therewith.

C. M. CURETON, Chief Justice.